THIEL and wife, Respondents, vs. DAMRAU, Appellant.

*October 7—November 9, 1954.*

For the appellant there were briefs and oral argument by *Rudolph L. Forrer* of Milwaukee.

For the respondents there was a brief and oral argument by *G. C. Johnson, Jr.,* of Oconomowoc.

CURRIE, J.   This appeal involves an unfortunate controversy between neighbors as to the true location of a boundary line separating their premises.  Plaintiffs are the record owners of lots 5, 6, and 7 in Tearney's subdivision in the community of Okauchee, in the town of Oconomowoc, Waukesha county, while the defendant is the record owner of lot 8 in said subdivision.  The west boundary line of lot 7 forms the east boundary line of lot 8, and it is the location of this line that is the crux of the controversy.  All four lots front on a public highway known as Tearney drive, which forms the north boundary line of the lots, and said lots extend in a southeasterly direction to Tearney lake upon which they abut, the lakeshore forming the south boundary of said lots.  Lots 5, 6, and 7 each have a frontage of 50 feet where they abut upon Tearney drive, while lot 8 has a frontage of 60 feet. The disputed boundary line does not run in a straight north and south direction but runs in a southeasterly direction from Tearney drive to the lake, the angle at which said line runs being indicated on the original plat of the subdivision which was prepared and recorded in 1921, said boundary line being approximately 95 feet in length.

One Lucy V. Connor, formerly Lucy V. Tearney, was the common owner and grantor of all four lots.  The plaintiff first purchased lots 5 and 6 from Mrs. Connor under warranty deed, dated November 12, 1929.  Then, John H. Baumgartner and Louise Baumgartner, being the parents of the defendant Gertrude Damrau, purchased lot 8 from Mrs. Connor by warranty deed, dated August 5, 1931, which conveyed said lot to them as joint tenants.  Some two months thereafter the plaintiffs acquired lot 7 from Mrs. Connor by warranty deed, dated November 6, 1931, lot 7 lying between the two lots

which plaintiffs had purchased originally in 1929, and lot 8 previously purchased by the Baumgartners. John H. Baumgartner died January 29, 1942, as a result of which his widow, Louise Baumgartner, became the sole owner of lot 8, as surviving joint tenant. She died intestate on February 1, 1946, leaving her daughter, the defendant Gertrude Damrau, as her sole heir at law, and a final decree was entered in the Louise Baumgartner estate by the county court of Milwaukee county assigning the title to lot 8 to the defendant as said sole heir at law.

At the trial both the defendant and her husband testified that, at the time of purchase of lot 8 by defendant's parents, there was a wooden stake on Tearney drive, and another on the lakeshore, marking the boundary line between lots 7 and 8. Plaintiffs' complaint also admits the existence of such stakes by reason of an allegation contained therein which specifically alleges that at the time plaintiffs acquired their three lots from Mrs. Connor "there were in existence stakes showing the boundary lines of all three lots, but that sometime thereafter said stakes disappeared."

The Baumgartners commenced the construction of a house upon lot 8 in the fall of 1931. The defendant Mrs. Damrau testified that the construction of such house was contracted for in the latter part of October, 1931. Construction must have been commenced about that time because there was offered and received in evidence a receipt for $300, dated November 20, 1931, from the mason contractor for work he had performed in constructing the basement of such house.

Both Mrs. Damrau and her husband testified that before construction was started the mason contractor and carpenter contractor were present on the premises when a line was stretched between the two wooden stakes marking the boundary line between lots 7 and 8 previously referred to, and that the house was set back so that it was approximately

eight to 10 feet to the west of said line so stretched between said two stakes. Mr. Damrau testified that said two stakes were pointed out by Mrs. Connor from whom the Baumgartners had purchased lot 8, and who then owned lot 7, as lot 7 was not conveyed to plaintiffs until November 6, 1931. Subsequently over the years such wooden stakes disappeared.

In 1932, the plaintiffs erected a home on lots 5 and 6, but no building was placed upon lot 7. There is a downward slope from the house erected by the Baumgartners on lot 8 to the east, which slope extends some distance into lot 7. The soil excavated from the Baumgartner house was placed so as to form a flat-topped plateau extending from the east side of the house eastward to the boundary line between lots 7 and 8, as marked by the two original wooden stakes. The top of this plateau was sodded with grass by Mr. Baumgartner and Mr. Damrau. The plaintiffs constructed and maintained a rock garden on the side of the slope below the top of the plateau.

There seems to have been no controversy between the parties as to the location of the disputed boundary line until 1947, when a survey was made at the instance of the plaintiffs which indicated that the dividing line between lots 7 and 8 was not where the parties previously thought it existed but was close up against defendant's house on lot 8. The defendant and her husband live in Milwaukee and have used the house for summer recreational purposes, while the plaintiffs reside permanently in their house located on lots 5 and 6. After the dispute arose over the boundary line, Mr. Damrau continued to cut the grass on the plateau during the times he and the defendant were occupying the house on lot 8, but when the Damraus were not there then the plaintiffs surreptitiously cut such grass.

At the trial two surveyors, Dancey and Connell, who had surveyed the disputed boundary line, testified in behalf of

plaintiffs, and one surveyor, Forrer, who had also surveyed such line; testified in behalf of defendant, and plats showing the results of such three surveys so made were received in evidence. The surveys by Dancey and Connell placed the disputed boundary line between lots 7 and 8 close up against defendant's house, such line being only one tenth of a foot from the southeast corner thereof and only 3.1 feet from the northeast corner thereof. On the other hand, the Forrer survey placed the disputed line 6.86 feet from the southeast corner and 10.75 feet from the northeast corner of the house. The trial court found that the surveys made by Dancey and Connell established the true boundary line as fixed by the recorded plat. If this case turned on the point of whether or not such finding of fact by the trial court was against the great weight and clear preponderance of the evidence we would necessarily have to affirm that part of the judgment so establishing the boundary line.

However, we believe the legal principle, which is determinative of the controversy, to be that where adjoining owners take conveyances from a common grantor which describe the premises conveyed by lot numbers, but such grantees have purchased with reference to a boundary line then marked on the ground, such location of the boundary line so established by the common grantor is binding upon the original grantees and all persons claiming under them, irrespective of the length of time which has elapsed thereafter.

The leading case laying down such principle is that of *Herse v. Mazza* (1904), 100 App. Div. 59, 91 N. Y. Supp. 778. In that case the common owners of premises located in a plat of village property had the premises surveyed and the line between lots 46 and 47 in block 83 marked. The opinion in the case does not state how the line was marked, but we assume it was by stakes as that is the usual method employed by surveyors. Thereafter, the premises on both sides of the

disputed line were conveyed by descriptions which merely referred to lot and block numbers. The defendants contended that such line so marked was erroneous, and, inasmuch as there had been less than twenty years acquiescence in the line as originally established, defendants were entitled to claim to the true line. The court in its opinion held against such contention and stated (pp. 62, 63) :

"This location as made upon the ground, and the acquiescence following are conclusive upon the defendants, and this boundary must remain as then located, even if it was located erroneously, as might subsequently be determined. . . . 

"It is insisted by the defendants that, in order to establish a line by practical location, there must be long acquiescence, not less than twenty years; and this would be so in order to establish a line other than the deed line, so as to make title in the party whose deed did not cover the disputed land, unless there was the element of estoppel in the case, but that rule will not apply where the location is fixed and the boundary marked upon the ground prior to the conveyance, and in reference to which boundary the conveyances have been made. The line established in that manner is presumably the line mentioned in the deed and no lapse of time is necessary to establish such location. The location does not rest upon acquiescence in an erroneous boundary but upon the fact that the true location was made and the conveyance made in reference to it."

*Maes v. Olmsted* (1929), 247 Mich. 180, 225 N. W. 583, is another case in which this same principle was applied. The disputed boundary related to a plat of summer-resort property on which the lots, instead of being numbered, as in the instant case, were described by the letters of the alphabet. The disputed line formed the boundary of lots E and F. The land was surveyed by the common owner and the boundaries of the lots or the plat were marked by stakes, and then the premises were conveyed by deeds which described the lots merely by the letters employed on the plat. After approxi-

mately fifteen years acquiescence by the owners of the lots E and F in the boundary as originally marked, a new survey disclosed that the true boundary line between such two lots was 25 feet too far north and litigation resulted. The Michigan court held that there had not been adverse possession for the required period of twenty years; nor was the principle applicable that, where a boundary line is in dispute and the parties by parol agreement fix the line and thereafter acquiesce in it, the parties will be bound thereby, because the testimony failed to disclose a *bona fide* dispute at the time the line was marked. The court then went on to declare (247 Mich. 183, 184, 225 N. W. 584, 585):

"There is, however, another species of acquiescence arising out of the practical location of a boundary line by a common grantor, 9 C. J. p. 244. The rule is stated in *Herse v. Mazza,* 100 App. Div. (N. Y.) 59, as reported in 91 N. Y. Supp. 778:

" 'Where adjoining owners took their conveyances from a common grantor with reference to a boundary line he had located on the ground, the deeds describing the tracts as certain lots in a block, the location was, irrespective of lapse of time, binding on the owners and those claiming under them. (Syllabus.) . . .'

"The principle is applicable here. The practical location of the boundaries of lot F was made by the common grantor in setting out the stakes, accepted, and acquiesced in by the grantee and his assigns for over fifteen years, with actual and continuous possession, defendants purchased with reference to such lines and are bound by the location."

The case of *Herse v. Mazza, supra,* has also been cited with approval in *Roetzel v. Rusch* (1935), 172 Okla. 465, 45 Pac. (2d) 518, and *Schmidt v. Williams* (1921), 34 Idaho, 723, 203 Pac. 1075. The Oklahoma court held the principles announced in *Herse v. Mazza* to be "clearly correct" and decisive of the issue before the court in *Roetzel v.*

*Rusch.* The Idaho court, while it acknowledged the correctness of the principle announced in *Herse v. Mazza,* held that it was not applicable in *Schmidt v. Williams* because there was a conflict in the testimony and the jury had found adversely to the contention of the defendants who had relied on such principle.

In the light of the undisputed facts in the case at bar it is our considered conclusion that the decisions of *Herse v. Mazza, supra,* and *Maes v. Olmsted, supra,* are applicable and necessarily control the result.

The testimony given by the Damraus in the instant case with respect to the presence and location of the stakes marking the boundary line between lots 7 and 8 at the time said lots were purchased by the plaintiffs and the Baumgartners stands undisputed by the plaintiffs or by any witness called by them. This is very significant in view of the fact that the plaintiffs' complaint alleged that there were stakes marking the boundary lines of lot 7 at the time plaintiffs purchased it from Mrs. Connor, which stakes have since disappeared, thus clearly establishing that plaintiffs knew of the existence of the two stakes testified to by the Damraus. Not only is the Damraus' testimony undisputed but there is nothing in the record to discredit such testimony or render it improbable. In fact, the probabilities are all in favor of its veracity. In the first place, it is highly improbable that the Baumgartners and their contractors would have erected the Baumgartner house practically on the east boundary line of lot 8 if the two stakes marking such boundary line, which admittedly were then present, had so indicated. Secondly, if the original two stakes had been where the Dancey and Connell surveys now place the disputed boundary line, it is also highly improbable that the plaintiffs would have sat idly by and permitted the owners of lot 8 to place the dirt on plaintiffs' premises which resulted from excavating the basement of the house built on lot 8,

and that they would have made no protest as to the owners of lot 8 using the strip comprising the top of the so formed plateau until after the survey made in 1947.

Positive uncontradicted testimony as to the existence of some fact, or the happening of some event, cannot be disregarded by a court or jury in the absence of something in the case which discredits the same or renders it against the reasonable probabilities. *Engmann v. Estate of Immel* (1884), 59 Wis. 249, 251, 252, 18 N. W. 182; *Quass v. Milwaukee G. L. Co.* (1919), 168 Wis. 575, 578, 170 N. W. 942; *Schulz v. General Casualty Co.* (1939), 233 Wis. 118, 129, 288 N. W. 803. Quotations from the opinions in such three cases are set forth in the dissenting opinion of Mr. Justice BROADFOOT in *Starry v. E. W. Wylie Co.* (1954), 267 Wis. 258, 263, 264, 64 N. W. (2d) 833. The majority opinion therein did not disapprove of the principle for which such three cases were cited in the dissenting opinion, but in effect held that the same was not applicable to an estimate of speed of a vehicle made by a witness who was 1,000 feet away and traveling in the same direction as the vehicle as to whose speed his testimony related.

In summary, when lot 8 was conveyed by Mrs. Connor to defendant's parents and lot 7 to plaintiffs there were then stakes marking the boundary line between such two lots. While the two deeds described the parcels conveyed by lot numbers, and not by metes and bounds, nevertheless, it is clear that it was the intention of the common grantor and the grantees that such stakes marked the common boundary line of the two parcels. Therefore, such grantees, and all persons claiming under them, are bound by such marked boundary line.

Although such stakes subsequently over the intervening years disappeared the undisputed testimony of the Damraus establishes that the boundary line as fixed by the Forrer

survey coincides with the location of the marked boundary line as it existed at the time of the original conveyances by the common grantor back in 1931 as closely as it is now possible to judicially determine the same. This conclusion on our part requires that the judgment of the trial court be reversed and the cause remanded so that a new judgment may be entered establishing the common boundary line between plaintiffs' and defendant's properties on the basis of the plat of the Forrer survey (defendant's Exhibit 7).

The counterclaim of the defendant prays for damages against the plaintiffs on the ground that the acts of the plaintiffs deprived her of the use of the disputed strip. However, the testimony disclosed that whenever defendant and her husband occupied the home on lot 8 they made full use of such strip. It was only in their absence that plaintiffs trespassed thereon and such trespass consisted solely of cutting the grass on the top of the narrow plateau. There is, therefore, no evidence upon which to base a finding of anything but nominal damages.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment upon defendant's counterclaim in behalf of defendant and against the plaintiffs in conformity with this opinion.