KRAUS and wife, Respondents, v. MUELLER, Appellant.*

*January 10—February 7, 1961.*

\* Motion for rehearing denied, without costs, on April 4, 1961.

For the appellant there were briefs by *Winton & Winton* of Shell Lake, and oral argument by *Ward Winton.*

For the respondents there was a brief by *Douglas, Omernik & Bitney* of Spooner, and oral argument by *W. W. Bitney*.

CURRIE, J. The premises, which are the subject of the instant controversy, lie within the eastern portion of the recorded plat of the First Addition to Belvidere Park. Such First Addition to Belvidere Park extends for a distance of approximately one and a quarter miles in an easterly and westerly direction along the north shore of Long lake. At the time of platting in 1907 it was originally surveyed by one Harmon, now deceased.

At the trial of the instant action, two surveyors, Andrews and Hoar, were called as witnesses and each testified as to the survey of the disputed area made by him, and plats showing the results of these two surveys were received in evidence. The plaintiffs rely on the survey made by Andrews while the defendant contends that Hoar's survey is the correct one. There is printed herewith a composite plat of both surveys that was included in the appellant-defendant's brief, which this court found very helpful in resolving the present appeal. In those respects in which the two surveys diverge from each other, the lot boundaries of the Hoar survey are shown in solid lines while those of the Andrews survey are shown in broken lines. The lower set of lot numbers are those of the Hoar survey while the upper row of lot numbers are those of the Andrews survey. It will be noted that two lot corner stakes are labeled "original stakes." The plaintiffs do not concede that such two stakes were placed in such locations by Harmon, who originally surveyed the plat in 1907, and the trial court found that the evidence was insufficient to establish them as such.

The plaintiffs are the record owners of lot 25 of block 4, and lots 1, 2, 3, 4, and 5 of block 5, together with the parcel marked "Road" lying between lot 25 and lot 1, having purchased the same in 1956. The defendant is the record owner of lots 22, 23, and 24 of block 4, she having acquired such

title in 1953. Since 1953 the defendant has been in possession of such lots 22, 23, and 24, according to the Hoar survey, and has been operating a summer resort thereon.

The trial court determined that the Andrews survey was correct and the Hoar survey incorrect. It also found that the defendant and her predecessor in title had acquired title by adverse possession of that part of the disputed territory lying west of the west boundary line of lot 1, block 5, according to the Andrews survey, and adjudged that the plaintiffs recover possession of the portion lying to the east of such boundary line. By referring to the plat printed herewith it will be seen that the parcel which the defendant was so required to surrender to the plaintiffs comprises the major portion of lot 24, block 4, according to the Hoar survey.

Andrews took as his starting point a meander post set in the section line, which section line formed the eastern boundary of the First Addition to Belvidere Park, as shown by the recorded plat thereof. Hoar grounded his survey upon the assumption that the rusted iron pipes constituting the two lot corner stakes, which are both indicated on the plat printed herewith as "original stakes," had been placed there as part of the original survey. One reason why the trial court rejected the Hoar survey was because it resulted in placing a small portion of lot 5 and all of lots 6, 7, and 8 to the east of the section line. There are also some facts present which cast serious doubt upon the correctness of the Andrews survey. However, we do not consider that it is necessary for us to resolve the issue of which of the two surveys is the correct one. This is because of our conclusion that such factor is not determinative of the instant controversy. Therefore, without deciding the point, we shall assume for the purposes of this appeal that the trial court's finding, that the Andrews survey is the correct one, is not against the great weight and clear preponderance of the evidence.

We will now proceed to give a resumé of the testimony and other evidence which we deem to be material. In so do-

ing, when reference is made to lot numbers, such reference is to their location as shown by the Hoar survey. This is because, prior to the time when the plaintiffs acquired their title in 1956, all the various prior owners had located their improvements upon their lands under the assumption that the location of the lots and their boundaries was as now shown on the Hoar survey.

Dr. W. T. Hurd, a dentist residing at Shell Lake, the county seat of Washburn county, purchased lots 22, 23, and 24 of block 4, from one Loop and wife, and in December, 1920, received a deed to such lots. At that time there was a furnished cottage, icehouse, and boathouse on the premises, the cottage being situated on lot 23. There was no highway then leading to the premises, the only access being by boat. There was then only one other cottage in First Addition to Belvidere Park, and this was some half mile to the west of the Loop cottage. In the spring of 1921, Dr. Hurd found at the southeast corner of lot 21, which was also the southwest corner of lot 22, a rotted wooden stake bearing a small metal plate on which was imprinted: "$\frac{B\ 4}{L\ 21}$." Alongside of such wooden stake was a one and a quarter-inch iron pipe driven into the ground. Dr. Hurd then took a piece of wooden stake eight inches long and whittled one end round so as to fit into the top of such pipe. He then removed the metal tag from the rotted stake and fastened it to this new piece of wood and inserted it in the top end of the pipe. This eight-inch piece of wooden stake having affixed such metal plate was brought into court and received as an exhibit. The recorded plat shows that all of the lots in the plat, except the easternmost lot in the plat (lot 8, block 5) have a uniform width at the lake shore of 66 feet. Dr. Hurd also found another wooden stake bearing a similar metal tag 66 feet to the west of the first-found stake, which second stake has since disappeared. He also found another one and a quarter-

inch iron pipe at the southeast corner of lot 24. When Hoar inspected these two iron pipes at the time of making his survey they protruded above the ground six to 10 inches and were rusty with age, indicating that they had been there for many years.

The topography of lot 24 was such that there was a ravine running in a northerly and southerly direction through the central portion of such lot. The outline of the outer edges of such ravine are shown on the plat printed herewith. In 1923 Dr. Hurd constructed a small building partially dug into the hillside on the east side of this ravine in the northeast portion of lot 24 fairly close to the east line of such lot. This was called the "Devil's Inn" and was used as a "hunting shack."

In September, 1921, Emily Hurd, Dr. Hurd's mother, acquired title to lot 25, and thereafter built a cottage on such lot 25. Dr. Hurd then constructed a bridge across the south end of the ravine on lot 24 in order that there would be a ready means of passage between his property and that of his mother. In 1938, Emily Hurd conveyed lot 25 to Mrs. Halsey, a sister of Dr. Hurd. In 1939, Mrs. Halsey conveyed such lot to Arthur F. Conrad, and in August, 1944, Conrad and wife conveyed it to Dr. Hurd who had purchased the same.

A Miss Mayme Davis acquired title to lot 1, block 5, in December, 1924, and built a cottage on such lot. In July, 1944, she conveyed such lot 1 to Dr. Hurd. Dr. Hurd, in August, 1949, conveyed such lot 1 and lot 25, block 4, to Conrad and wife, and also included in the deed description the parcel marked "Road" on the plat lying between such two lots. Thus, Dr. Hurd had title as common owner of lot 25, block 4, and lot 1, block 5, together with lots 22, 23, and 24, block 4, for a five-year period from 1944 to 1949. There was no change in title of such lots 1 and 25 until Conrad and wife conveyed to the plaintiffs in 1956. Dr. Hurd continued as

owner of such lots 22, 23, and 24 until he conveyed to the defendant in 1953.

Dr. Hurd testified that there had been an iron pipe placed at the northeast corner of lot 24 before his conveyance to the Conrads in 1949. Thus at the time of such conveyance the boundary line between lots 24 and 25 was marked by iron pipes at the two common corners. Furthermore, there were existing cottages on both lots 25 and 1, one built by Mrs. Emily Hurd and the other by Miss Davis. Dr. Hurd testified the two iron pipes at the southeast and northeast corners of lot 24 marked the boundary line between the property sold to the Conrads in 1949 and the lots retained by him, and that he intended it to be the boundary line.

The undisputed evidence also gives rise to but one reasonable inference as to whether the Conrads also purchased their premises in 1949 with reference to such boundary line, and such inference is that they did. Dr. Hurd testified that no one attempted to interfere with his possession of lots 22, 23, and 24 during the approximate thirty-two years that he owned the same ending in 1953. Thus the Conrads must have been satisfied that the cottages which they bought were those located on lots 25 and 1, and not buildings over on lots 22 and 24 owned by Dr. Hurd where they would have to be if the Andrews survey is correct. Buildings may themselves constitute monuments which are material in establishing disputed boundary lines. *Racine v. J. I. Case Plow Co.* (1883), 56 Wis. 539, 541, 14 N. W. 599. The Conrads undoubtedly were familiar in 1949 with the location of such two cottages because Conrad had owned lot 25 for the five-year period of 1939 to 1944. It would be a wholly unreasonable inference to assume that, when the Conrads accepted the 1949 deed from Dr. Hurd, they did not intend to acquire the actual land on which such two cottages stood but instead some parcel that might be fixed by future survey, which as it turned out is some 200 feet to the west.

In *Thiel v. Damrau* (1954), 268 Wis. 76, 66 N. W. (2d) 747, the title of both parties to a boundary dispute had passed through a common grantor, as in the instant case, and the boundary line separating the two parcels, at the time of the first conveyance by such common grantor, likewise had been marked by two stakes. This court in its opinion stated (p. 81):

"However, we believe the legal principle, which is determinative of the controversy, to be that where adjoining owners take conveyances from a common grantor which describe the premises conveyed by lot numbers, but such grantees have purchased with reference to a boundary line then marked on the ground, such location of the boundary line so established by the common grantor is binding upon the original grantees and all persons claiming under them, irrespective of the length of time which has elapsed thereafter."

We are satisfied that such principle controls the decision of the instant appeal. While there is no direct testimony that Dr. Hurd at the time of the 1949 conveyance to the Conrads pointed out the two corner stakes marking the boundary between lots 24 and 25, the Conrads' subsequent conduct is only consistent with the fact that they did purchase on the basis that this was the western boundary line of the premises bought. The Conrads acquired no title to any of Dr. Hurd's property lying to the west of such boundary line, and, therefore, neither did the plaintiffs, as grantees of Conrad.

Counsel for the plaintiffs contend that the principle so enunciated in the *Thiel Case* is only applicable to a situation where a legitimate doubt exists as to the true location of a disputed boundary line. They further assert that there was nothing doubtful about the instant boundary line, or of the lots described in the conveyance from Dr. Hurd to the Conrads, because the Andrews survey has accurately established the same. Apparently counsel have in mind the holdings in cases such as *Rottman v. Toft* (1925), 187 Wis. 558, 204

N. W. 585, and *Pickett v. Nelson* (1888), 71 Wis. 542, 37 N. W. 836, in which a disputed boundary was settled by parol agreement followed by acquiescence in the boundary so established.

The controlling principle of the *Thiel Case* is grounded upon an entirely different basis. It is a rule for ascertaining the intention of the parties with respect to the location of premises described by lot number in a conveyance which is executed by a grantor who conveys only part of an area of land owned by him. Applied to the instant fact situation, it resolves the question of whether Dr. Hurd and Mr. and Mrs. Conrad intended the 1949 deed to convey to the Conrads the land on which stood the cottages erected by Emily Hurd and Mayme Davis, or whether they intended it to convey other lands owned by Dr. Hurd some 200 or more feet to the west where the Andrews survey now places the lots described in such deed.

Counsel for the respondents also attempt to make a point of the fact that Dr. Hurd had Andrews make a survey for him in 1944, and assert that Dr. Hurd therefore knew when he conveyed to the Conrads in 1949 where the true lot lines were. However, Andrews testified that Dr. Hurd disagreed at the time with the findings of such survey. An abstract of title, which is one of the exhibits in the record offered in evidence by the plaintiffs, discloses an affidavit by Hoar recorded in 1950 in the office of the register of deeds of Washburn county. Such affidavit states that Hoar in 1948 made a survey of the eastern portion of block 4 extending as far east as lot 15, and all of block 5, and established the east line of lot 24, block 4, by a metes-and-bounds description tied into the section line to the east. A reading of the description in such affidavit convinces us that the east line of lot 24 so described in this affidavit is located as shown in the plat of Hoar's survey received in evidence in this case. Such affidavit also establishes the existence of an iron stake at the

northeast corner of lot 24 in 1948, thus corroborating Dr. Hurd that such a stake was in existence when he conveyed to the Conrads in 1949.

We attach no legal significance to the fact that in 1949 Dr. Hurd knew of the Andrews 1944 survey. This is because he rejected such survey for the reason that it was not in accord with the iron and wooden stakes he had previously found on the lake shore which he believed to have been placed there at the time of the surveying of the original plat.

We are also of the opinion that the defendant proved title by twenty years' adverse possession by Dr. Hurd of that part of lot 24, block 4 (according to the Hoar survey), on which stood the deer-hunting shack known as the "Devil's Inn." Dr. Hurd testified that he occupied it every year from the time it was built until 1953, which is a considerably longer period than twenty years. Lot 24 was then covered with a growth of high bushes and the testimony does not disclose what part of such lot was made use of at the time the Devil's Inn was occupied during deer-hunting seasons. Therefore, the testimony falls short of establishing that there was more than twenty years' adverse possession of the entire lot.

The fact that such hunting shack was only occupied during the hunting season each year does not militate against its being sufficient to constitute adverse possession so long as such use was exclusive. In an annotation entitled, "Adverse possession: Sufficiency, as regards continuity, of seasonal possession other than for agricultural or logging purposes," 24 A. L. R. (2d) 632, 633, the author states:

"The requirement of continuity of possession as one of the essential elements of adverse possession is satisfied, as regards activities which are seasonal in character (other than those relating to agriculture and logging), by the use of land commensurate with and appropriate to existing seasonal uses, needs, requirements, and limitations, having regard for the location and adaptability of the land to such uses."

Such rule is particularly applicable to a fact situation, such as we have here, when a building is erected on the premises. This is because such structure is continuous notice to all the world that the person who has built it there may claim some right in the premises. For a hunting-cabin case somewhat similar in facts to the instant one, see *Monroe v. Rawlings* (1951), 331 Mich. 49, 49 N. W. (2d) 55.

Rather than for this court to attempt to modify and amend the judgment so as to establish the boundary line between the plaintiffs' and defendant's premises on the basis of the east line of lot 24, block 4, according to the Hoar survey, we consider it advisable to reverse and remand to the circuit court in order that such line can be so described as to tie it into the section line to the east. We are inclined to think that the necessary data for so doing is to be found in the recorded Hoar affidavit previously referred to (Entry No. 117 of the abstract constituting plaintiffs' Exhibit 2).

*By the Court.*—Judgment reversed, and cause remanded with directions to enter a judgment in favor of the defendant and against the plaintiffs in accordance with this opinion. Defendant's request under Supreme Court Rule 10, sec. 251.264, Stats., for permission to tax printing costs of her brief in excess of 50 pages is granted.

The following opinion was filed April 4, 1961:

CURRIE, J. (*on motion for rehearing*). The brief submitted in behalf of the plaintiffs in support of their motion for rehearing attacks the factual basis upon which we determined that the result of the appeal was controlled by the principle enunciated in *Thiel v. Damrau* (1954), 268 Wis. 76, 66 N. W. (2d) 747. At page 436 of our original opinion we stated:

"In 1938, Emily Hurd conveyed lot 25 to Mrs. Halsey, a sister of Dr. Hurd. In 1939, Mrs. Halsey conveyed such

lot to Arthur F. Conrad, and in August, 1944, Conrad and wife conveyed it to Dr. Hurd who had purchased the same.

"A Miss Mayme Davis acquired title to lot 1, block 5, in December, 1924, and built a cottage on such lot. In July, 1944, she conveyed such lot 1 to Dr. Hurd. Dr. Hurd, in August, 1949, conveyed such lot 1 and lot 25, block 4, to Conrad and wife, and also included in the deed description the parcel marked 'Road' on the plat lying between such two lots. Thus, Dr. Hurd had title as common owner of lot 25, block 4, and lot 1, block 5, together with lots 22, 23, and 24, block 4, for a five-year period from 1944 to 1949. There was no change in title of such lots 1 and 25 until Conrad and wife conveyed to the plaintiffs in 1956. Dr. Hurd continued as owner of such lots 22, 23, and 24 until he conveyed to the defendant in 1953."

Counsel for the plaintiffs now point out that after Andrews made his survey in 1944, quitclaim deeds were exchanged in 1944 by Dr. Hurd with Conrad and wife, and also between Hurd with Mayme Davis, so as to correct the descriptions of their respective properties and bring them in line with the Andrews survey. It is asserted that the deeds mentioned in the afore-quoted extract from our original opinion as having been executed to Dr. Hurd by Mayme Davis in July, 1944, and by Conrad and wife in August, 1944, were two of such four exchange quitclaim deeds.

The 1944 exchange quitclaim deeds so referred to, apparently made with reference to the Andrews survey, are shown in the abstract (plaintiffs' Exhibit 2) and are as follows:

*Entry No. 99 of Abstract:* Mayme Davis as grantor to Hurd as grantee, dated July 24, 1944, conveying lot 1, block 5. (This would be lot 24, block 4, according to the Hoar survey.)

*Entry No. 98 of Abstract:* Hurd and wife as grantors to Mayme Davis, as grantee, dated July 24, 1944, conveying lot 4, block 5. (This would be lot 1, block 5, according to the Hoar survey.)

*Entry No. 103 of Abstract:* Conrad and wife, as grantors to Hurd, as grantee, dated August 7, 1944, conveying lot 25, block 4. (This would be lot 22, block 4, according to the Hoar survey.)

*Entry No. 100 of Abstract:* Hurd and wife, as grantors, to Conrad and wife, as grantees, dated July 24, 1944, conveying lot 2, block 5. (This would be lot 25, block 4, according to the Hoar survey.)

Thus Conrad and wife, and not Dr. Hurd, had title to lot 25, block 4, from August, 1944, until August, 1949, and beyond, and Hurd was not the common owner of lots 24 and 25, block 4, at the time he and his wife executed the deed to the Conrads in August, 1949. (These descriptions are according to the Hoar survey.) Therefore, our original opinion was in error in holding that the principle of *Thiel v. Damrau, supra,* controlled the disposition of the instant appeal.

Such 1949 deed to the Conrads is shown at Entry No. 116 of the abstract, and purported to convey lot 25, block 4; lot 1, block 5; and the private road lying between them. Such deed is a warranty deed reciting a consideration of one dollar and other valuable consideration. No revenue stamps were affixed thus indicating that such conveyance was not the result of a sale but rather one to clear title. The notary who acknowledged the deed was a layman and not a lawyer. In the meantime, Hoar had made his survey in 1948, and we are inclined to assume that the description employed has reference to that survey rather than the Andrews survey inasmuch as Hurd disapproved of the latter.

If the assumption is made that all descriptions in conveyances material to this controversy, which antedate the 1944 Andrews survey, together with all conveyances made subsequent to the Hoar survey in 1948, coincide with those of the Hoar survey, while those made between the dates of

1944 and 1948, including the four 1944 exchange quitclaim deeds, have reference to the Andrews survey, the pieces of the puzzle fall in place and a logical explanation is afforded of the acts of possession of the various parties. No other hypothesis will provide such result.

In our original opinion we did not expressly approve the determination of the trial court that the Andrews survey is the correct survey. We now so do. However, we invoke our discretionary power under sec. 251.09, Stats., in the interest of justice, to reverse the judgment below and remand for further proceedings. The defendant shall be afforded an opportunity to amend her answer so as to counterclaim for reformation of the description in the afore-described 1949 deed from Hurd and wife to Conrad and wife shown at Entry No. 116 of the abstract (plaintiffs' Exhibit 2). Inasmuch as the grantors Hurd and the grantees Conrad have no further interest in the premises it is not necessary that they be joined as parties. *Grossbach v. Brown* (1888), 72 Wis. 458, 40 N. W. 494, and 76 C. J. S., Reformation of Instruments, p. 425, sec. 70 a (3).

If the defendant elects to amend and pray for such reformation, the case should be reopened for the taking of further testimony to permit all parties to present evidence on such issue of reformation. We consider that the acts of possession, on the part of Dr. Hurd and the Conrads of the cottages on the various parcels before and after the execution and delivery of such 1949 deed, would be most material on the issue of what premises were intended by the parties to such deed to be identified by the description employed therein.

The plaintiffs have acquired no intervening rights which would bar such reformation. This is because there were buildings on some of the land conveyed to them in 1956 by the Conrads, which buildings were occupied by the defendant, or her tenants, under the trial court's holding that the de-

scription in such 1956 deed is held to be in accordance with the Andrews survey. Such occupancy was notice to the world that the defendant claimed some rights to such premises. *Miller v. Green* (1953), 264 Wis. 159, 58 N. W. (2d) 704, 37 A. L. R. (2d) 1104, and *Ubbink v. Herbert A. Nieman & Co.* (1953), 265 Wis. 442, 62 N. W. (2d) 8.

In conclusion, we desire to point out that counsel for the plaintiffs must share with the court the responsibility for the fact that two of the four exchange deeds of 1944 were not discovered and mentioned in the original opinion. Not only did the original briefs of both parties fail to call attention to such deeds, but in two different places in plaintiffs' brief (pages 25 and 32), it was conceded that common ownership of lots 24 and 25, block 4, according to the Hoar survey (lots 1 and 2, block 5, according to the Andrews survey), did rest in Dr. Hurd. We quote from page 32 of plaintiffs' original brief:

"Furthermore, in 1944 Doctor Hurd owned all of these lots as has been previously pointed out to the court. He could have conveyed by metes and bounds from the section line and accurately established the boundaries between his grantees, dividing the buildings according to his wishes. This he neglected to do although the county surveyor [Andrews] had pointed out to him that the buildings were improperly located."

*By the Court.*—The prior mandate is vacated. The judgment is reversed, and cause remanded for further proceedings not inconsistent with this opinion. No costs are to be taxed by either party on this appeal. The motion for rehearing is denied without costs.