STATE, Appellant, v. PUBLIC SERVICE COMMISSION, Respondent.

*March 5—April 3, 1962.*

232

For the appellant the cause was argued by *Roy G. Tulane,* assistant attorney general, with whom on the brief was *John W. Reynolds,* attorney general.

For the respondent Public Service Commission there was a brief and oral argument by *William E. Torkelson,* chief counsel.

For the applicant Langlade county there was a brief and oral argument by *James H. Whiting,* district attorney.

BROWN, J.   The proposed dam would be constructed in Langlade county where County Trunk A crosses the Wolf river. It will be approximately 60 feet wide and inundate between 1,400 and 1,600 acres of land. The dam pool will be 13½ feet deep at the dam and extend nine miles upstream. According to its proponents the basic purposes of the dam are to enhance recreation and wildlife propagation and water conservation and to increase property values and the tax base.

The dam will not be used for hydroelectric purposes.

The opponents of the construction do not dispute these purposes but they submit that a dam on the Wolf river will destroy trout fishing for at least 21 miles downstream.

The P. S. C. made, among others, these findings which are objected to by appellant as "not supported by substantial evidence in light of the entire record:"

"4. The pool held by the dam at normal elevation would be 13½ feet deep at the dam and extend some nine miles upstream to the Post lake outlet to raise the tailrace of the Post lake dam 0.5 feet. The pool would back up the follow-

ing tributaries to the Wolf river listed in their order upstream from the damsite:

"Hunting river on the west side; and

"Pickerel creek, Spider creek, and Swamp creek on the east side.

"5. The Wolf river in the proposed pool area has little slope and is largely grass marsh. It is not trout water. It supports a warm-water fishery. The Wolf river below County Trunk Highway A has generally a steep slope. It is classed as trout water and supplies trout fishing in the early season of the year ending sometime after June 1st when the water is warmed.

"6. In early years a logging dam was maintained near the location of the proposed dam and some obstruction remained until 1940. While the pool was held it appears that fishing for species other than trout was good above the dam; that trout fishing was good downstream.

"7. The purpose of the proposed dam is to hold a pool to increase the recreational use of the area for fishing, hunting, boating, and development of shore properties. The dam is designed to have discharge of flow through the submerged gates which is presumed to be of cooler water than the surface of the pool. . . .

"9. The Wolf river from Post lake to County Trunk Highway A is naturally subjected to maximum warming under summer conditions. It has little slope, meanders generally through a marsh valley without cover, and its course has substantial enlarged areas.

"The proposed Wolf river dam as operated to discharge low and normal flows through the submerged gates would pass these flows downstream at temperatures no higher than those effected by the existing conditions.

"10. . . . The only navigational use of the stream immediately above and below County Trunk Highway A has been by rubber boats,—not a commonly used watercraft. . . .

"13. The construction, operation, and maintenance of the proposed dam will not materially obstruct existing navigation or violate other public rights and will not endanger life, health, or property."

Although appellant objected to most of the P. S. C.'s findings, its contentions on this appeal are concerned solely with the findings as to the effect of the dam on the downstream trout population. Its theory is that construction of this dam violates a public right (trout fishing) and the P. S. C. could not disregard the "positive uncontradicted testimony" of Conservation's expert, Posekany, and accept the "testimony of laymen on a technical subject."

Sec. 31.06 (3), Stats., relating to hearings upon applications for permits to construct dams, states:

". . . if it shall appear that the construction, operation, or maintenance of the proposed dam will not . . . violate other public rights . . . the commission [P. S. C.] shall so find and a permit is hereby granted to the applicant. . . . In considering public rights to the recreational use and natural scenic beauty of the river, the commission shall . . . weigh the recreational use and scenic beauty thereof against the known recreational use and scenic beauty of the river in its natural state, . . ."

Appellant asserts that the P. S. C. ignored the language of the statute in granting Langlade county its permit. It argues that "the sole competent evidence on the critical issue, that is—whether or not the creation of a shallow, slack water flowage would destroy some 21 miles of the Wolf river downstream as trout habitat—was the testimony of Mr. Lewis Posekany." The appellant submits that it was clear error for the P. S. C. to ignore this testimony and for it to rely on the testimony of laymen on a technical subject compounded the error.

Posekany, an expert in limnology (scientific study of biological conditions in fresh-water bodies), testified that he had originally recommended that the Conservation Department oppose the dam. He stated (and respondent agrees) that water temperatures over 81 degrees F. are lethal to trout. He further testified that it was his opinion

that the pool formed by the proposed dam would be warmed by the sun through insolation. When this "warmed water" was released through the dam and down the river, Posekany believed it would destroy the trout population. He said that this was his sole reason for opposing construction of the dam.

The dam proponents stated they could overcome this discharge of warmed water through the use of "undershot gates." These gates would take only water from the bottom of the dam pool and release it downstream and this water would be cooler than the water at the surface. Posekany disagreed with this theory. He testified that in "a body such as [will be] created here, so shallow, by and large there will be no layering of the water. The water in this flowage in my estimation based on experience in similar flowages in Wisconsin at similar latitudes will be as close to homogeneous in temperature as is possible for a nonstatic body to be. . . . I would be very much surprised if the maximum temperature variation between the top and the bottom was as much as one degree, except for platters of water that might float around on the surface." Thus, he concluded that the undershot gates would have no appreciable effect on keeping the water cold enough for trout survival.

William Cartwright, a P. S. C. engineer, subsequently made a water-temperature study at the dams at the outlet of the nearby Post lake and the Little Rice reservoir. Cartwright used Conservation Department equipment (which the department now states may have been unreliable) and was assisted by Posekany in the study. The purpose of this study was to determine whether "there was stratification of the water as to temperature so that a discharge of water from the bottom of the pool would not have the detrimental effects claimed by the Conservation Department." The readings generally showed that water emerging from the bottom of the dam was colder than water on the pool

surface. Posekany later testified that the data were inaccurate and lacked significance.

There were also 14 other lay witnesses who testified for the proponents. Some of them told of dam benefits not pertaining to trout. Others, basing their testimony on their fishing experience with the Wolf, testified that in their opinion such a dam as projected would not affect the trout fishing there. Some of them testified that to their own recollection years ago there was a logging dam across the Wolf near the site of the proposed new dam which created a pool of an area of the approximate size to be created by the new dam, which old dam did not adversely affect the downstream trout fishing. These were trout fishermen experienced in this part of the river. Their testimony based on their own experience is competent on the effect of the former dam and the probable effect of a new one. The P. S. C. could properly consider the lay testimony that trout fishing downstream was good in the days of the logging dam—which has now disappeared—and could also consider that Posekany testified that in a recent year there were temperatures lethal to trout in the Wolf river below the damsite for periods lasting for days from early July to mid-August even though there was then no dam.

The testimony and data of Cartwright appear admissible. He admitted he was not a limnologist. However, his testimony was in the field of engineering, not limnology. There is no dispute as to what water temperature is fatal to trout. His findings concern the effect of dams on water temperature, upon which he is competent. The weight to be accorded his opinions on water temperature as compared with Posekany's is for the P. S. C. to determine. Sec. 227.20 (2), Stats. 1959, directs a reviewing court to give "due weight" to the "experience, technical competence, and specialized knowledge of the agency involved, as well as discretionary authority conferred upon it."

In affirming the P. S. C. order authorizing a construction permit, the circuit court concluded there was "substantial evidence in the record to support the commission findings in all material respects." The learned trial judge held that:

"The court cannot substitute its appraisal of the evidence for that of the commission. So long as we conclude, which we do, that there was substantial evidence in the record to support the finding, we cannot upset the commission finding. We must accord due respect to the expertise of the commission which we conceive extends to all matters affecting dam construction and engineering. Although we do not consider the commission or its staff to be experts in limnology, we do acknowledge their competence to deal with the specific question of water temperatures in the Wolf above and below the proposed dam and the probable effect the construction of such dam will have upon such water temperatures and trout habitat. This is not a subject reserved exclusively to the limnologist. The commission was entitled to consider testimony by inhabitants of the area and of their own engineer."

A trier of the fact is required to accept positive uncontradicted testimony as to the existence of a fact in absence of something in the case which discredits the same or renders it against reasonable probabilities. *Thiel v. Damrau* (1954), 268 Wis. 76, 66 N. W. (2d) 747. However, Posekany's testimony is disputed by Cartwright's data and the evidence of certain area residents familiar with fishing in this part of the river. The weight to be given the conflicting testimony was a decision for the trier of the fact (P. S. C.).

After all, the legislature, assigning appropriate standards, intrusted to the P. S. C. the erection and regulation of dams in navigable waters, of which the Wolf river is one. Sec. 30.10 (2) and ch. 31, Stats. If it chose to do so, the legislature might have substituted the Conservation Department for the Public Service Commission as the regulatory body. It is enough to say that the legislature did not do so. The

views of the Conservation Department are entitled to be carefully considered by the P. S. C. in Conservation's special field and no doubt the P. S. C. so considers them, but the responsibility of issuing or denying permits for dams remains with the P. S. C. As between the two administrative agencies, it is for the P. S. C. to evaluate the pertinent evidence. We consider that the record as a whole provides substantial evidence in support of the P. S. C.'s findings and on such findings P. S. C. is required to issue the permit as a matter of law. Sec. 31.06 (3), *supra.*

We note, as did the trial court, that the P. S. C. order granting the permit to the county requires the county to submit for the commission's approval the final plans for the dam structure before construction is started.

The judgment is affirmed.

The trial court denied appellant's motion to remand the matter to the P. S. C. for further testimony. We consider this to lie within the trial court's discretion. There were three hearings before the commission. We do not think it was an abuse of discretion that the trial court did not require a fourth.

*By the Court.*—Judgment and order affirmed.

DIETERICH, J. (*dissenting*). I respectfully dissent from the majority opinion sustaining the judgment and order of the trial court denying the Conservation Department's motion to remand the matter to the Public Service Commission for further testimony.

Sec. 23.09, Stats., states that the purpose of the Conservation Act (under which the Conservation Commission derives its powers) "is to provide an adequate and flexible system for the protection, development and use of forests, fish and game, lakes, streams, plant life, flowers, and other outdoor resources in the state of Wisconsin." The Conservation Department is thus accorded by the legislature the

exclusive authority to deal with all matters relative to our outdoor resources, which in the instant case consist of trout-fishing resources.

The decision of the Public Service Commission should be reversed as being "(e) arbitrary or capricious" [1] and the matter should be remanded to the Public Service Commission for further testimony. Sec. 227.20 (2), Stats., states that "upon review due weight shall be accorded the experience, technical competence, and specialized knowledge of the agency involved, . . ." In the instant case two agencies are involved. The Public Service Commission, created by the legislature, has the authority to grant permission to build dams, while the Conservation Department was granted authority and power to protect wildlife, game, fish, etc. In view of this, I believe that in the present situation the legislature intended that due weight should be given to the experience and competency of both interested agencies. The Public Service Commission did not give adequate weight to the expertise of the Conservation Department with regard to the proposed dam's effect on trout fishing. For that reason the order of the Public Service Commission should be reversed and a further hearing held at which "due weight shall be accorded the experience, technical competence, and specialized knowledge" of the Conservation Department.

---

[1] Sec. 227.20 (1) (e), Stats.