**2019 WI App 66**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:         2018AP858-CR

†Petition for Review filed

Complete Title of Case:

> **STATE OF WISCONSIN,**
>
> **PLAINTIFF-APPELLANT,**
>
> **V.**
>
> **BRIAN L. HALVERSON,**
>
> **†DEFENDANT-RESPONDENT.**

---

Opinion Filed:      November 13, 2019
Submitted on Briefs: August 6, 2019
Oral Argument:

---

JUDGES:        Stark, P.J., Hruz and Seidl, JJ.
    Concurred:
    Dissented:

---

Appellant
ATTORNEYS:      On behalf of the plaintiff-appellant, the cause was submitted on the briefs
                of *Roy La Barton Gay,* assistant district attorney, Chippewa Falls, and
                *Joshua L. Kaul*, attorney general, and *Sarah L. Burgundy*, assistant
                attorney general.

Respondent
ATTORNEYS:      On behalf of the defendant-respondent, the cause was submitted on the
                brief of *Megan Sanders-Drazen*, assistant state public defender of
                Madison.

COURT OF APPEALS
DECISION
DATED AND FILED

November 13, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP858-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2017CM83

**IN COURT OF APPEALS**

---

STATE OF WISCONSIN,

PLAINTIFF-APPELLANT,

V.

BRIAN L. HALVERSON,

DEFENDANT-RESPONDENT.

---

APPEAL from orders of the circuit court for Chippewa County: STEVEN R. CRAY, Judge. *Reversed and cause remanded with directions*.

Before Stark, P.J., Hruz and Seidl, JJ.

¶1 HRUZ, J. The State of Wisconsin appeals both an order granting Brian Halverson's motion to suppress evidence and an order denying its motion for reconsideration. Halverson argues that his admission to a crime made during a telephone call with a police officer while Halverson was incarcerated should be

suppressed because the officer's failure to provide *Miranda*[1] warnings violated his constitutional rights. Halverson relies upon a case from our supreme court, *State v. Armstrong*, 223 Wis. 2d 331, 588 N.W.2d 606 (1999), which held that an incarcerated person is per se in custody for purposes of *Miranda*. The State, however, contends that a subsequent United States Supreme Court case, *Howes v. Fields*, 565 U.S. 499 (2012), effectively overruled *Armstrong*'s per se custody rule.

¶2 We hold that *Howes* effectively overruled *Armstrong*. *Armstrong* relied solely upon federal case law interpreting the Fifth Amendment to the United States Constitution when it created the per se custody rule; it did not rely on any unique rights or protections afforded under the Wisconsin Constitution. *Howes* now teaches that the cases upon which *Armstrong* relied do not establish that a person who is incarcerated is always in custody for purposes of *Miranda* when he or she is isolated from the general prison population and questioned about conduct that occurred outside of the prison. Instead, custody is determined by analyzing the totality of the circumstances surrounding the interrogation in question.

¶3 We also reject Halverson's invitation to interpret the Wisconsin Constitution—specifically, article I, section 8—as "more fully protect[ing] the right against compelled self-incrimination" than the rights afforded to individuals under the Fifth Amendment, so as to retain *Armstrong*'s per se custody rule as a matter of state constitutional law. Consequently, we conclude the circuit court

---

[1] *See* *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

erred by applying *Armstrong*'s per se custody rule instead of the totality-of-the-circumstances analysis outlined in *Howes*.

¶4 Assessing the totality of the circumstances surrounding Halverson's telephone interrogation, we conclude he was not in custody for *Miranda* purposes. Accordingly, the officer's failure to provide Halverson with *Miranda* warnings did not violate Halverson's constitutional rights. We therefore reverse the circuit court's orders granting Halverson's motion to suppress and denying the State's motion for reconsideration, and we remand with directions to deny Halverson's suppression motion.

## BACKGROUND

¶5 In July 2016, Stanley Police Department officer Matthew Danielson read a letter from an inmate at the Stanley Correctional Institution in which the inmate accused Halverson of stealing and destroying several of the inmate's valuable documents. During Danielson's subsequent visit with the inmate at Stanley Correctional, the inmate informed Danielson that he possessed two letters in which Halverson admitted to the theft and destruction of the inmate's property.

¶6 Danielson subsequently sought to speak with Halverson and eventually discovered that Halverson was being held in the Vernon County Jail, where he was on a probation hold. When Danielson called the jail, he spoke to an individual who told Danielson that jail staff would contact Halverson and have him return Danielson's call. Halverson returned Danielson's phone call less than ten minutes later.

¶7 Danielson began the conversation by introducing himself, explaining why he was calling, and asking Halverson if he knew the inmate at Stanley

Correctional. Halverson replied that he did know the inmate. Upon Danielson asking Halverson what he knew about the inmate's missing documents, Halverson first responded that he had helped the inmate clean his cell and the documents may have "happened to go in the garbage." Danielson then asked Halverson "what he would say" if Danielson said he possessed two letters in which Halverson acknowledged the theft and destruction of the documents. Halverson then admitted that he had destroyed the documents. Halverson was subsequently charged with criminal damage to property and misdemeanor theft, both as repeat offenses.

¶8 Halverson moved to suppress all evidence obtained and derived from his phone call with Danielson. Halverson asserted that his conversation with Danielson was a custodial interrogation and that Danielson was required to inform Halverson of his *Miranda* rights before Danielson questioned him. Halverson contended that Danielson failed to do so.

¶9 Danielson was the sole witness to testify at the suppression hearing. In addition to explaining why he sought to speak with Halverson, Danielson described the circumstances surrounding the phone call. The return call occurred at approximately 10:00 a.m. The call lasted only three to four minutes. Danielson's tone of voice throughout the call was "just as it was" during his testimony at the suppression hearing; Danielson never raised his voice, threatened or made any promises to Halverson. Danielson also never heard any individual yell or threaten Halverson on the other end of the phone. Further, at no point did Halverson ever refuse to talk with Danielson or request an attorney.

¶10 Danielson acknowledged that he did not provide Halverson with the *Miranda* warnings. When asked why, Danielson responded, "I don't know…. I

4

didn't think of him [as] being … in custody. He was speaking to me freely on the phone. Yes, he was in custody somewhere else for something else, but he wasn't in custody with me." Danielson further stated that he "was not in a position to arrest" Halverson the day he spoke with Halverson, but he acknowledged that he never informed Halverson that he could terminate their conversation.

¶11 On cross-examination, Danielson admitted that he did not have any knowledge of where Halverson was located inside the Vernon County Jail when they were speaking. Consequently, Danielson could not testify as to whether Halverson was handcuffed or in a locked room during their phone call.

¶12 The circuit court granted Halverson's suppression motion. The court determined that *Armstrong* "created a very strong rule" in holding "that a person who is incarcerated is per se in custody for purposes of *Miranda*." *See Armstrong*, 223 Wis. 2d at 355. Relying upon *Armstrong*, the circuit court concluded Halverson was interrogated while in custody, and, therefore, Danielson was required to *Mirandize* Halverson.

¶13 The State had argued that Halverson was not in custody for purposes of *Miranda* when assessing Danielson and Halverson's conversation under the totality of the circumstances, relying upon the United States Supreme Court's decision in *Howes*. In the State's view, the Supreme Court's decision in *Howes* effectively overruled *Armstrong*'s per se custody rule.

¶14 The circuit court disagreed with the State. The court opined that Wisconsin's per se custody rule under *Armstrong* survived the *Howes* decision, in part because the circuit court concluded that Halverson's interrogation and the interrogation at issue in *Howes* were factually distinguishable. However, before concluding the hearing, the court reserved the right for the State to move for

reconsideration if it believed there was testimony from a jail officer that would affect the court's decision. The State subsequently filed a motion for reconsideration, and the court held a hearing on that motion.

¶15 Matthew Hoff, a corporal with the Vernon County Sheriff's Department, testified for the State. Hoff had been employed by the sheriff's department and worked in the county's jail for thirteen years. Hoff was on duty the day Danielson spoke with Halverson by phone and was "familiar" with Halverson, but Hoff testified that neither he nor his coworkers specifically recalled Halverson receiving a phone call that day.

¶16 Hoff then testified regarding the jail's standard operating procedures for when an inmate receives a phone call. A call is first received by the officer working in the mass control room. That officer then informs officers on the jail floor that an inmate has received a call. If there are officers available, the inmate is instructed to leave the jail pod[2] and meet a floor officer after passing through a set of doors.

¶17 The floor officer then informs the inmate that he or she has a phone call. The inmate is told the caller's identity, and he or she is given the choice to take or reject the call. Hoff explained:

> At any time the inmate can tell us he doesn't want to talk to whatever individual is on the other line because we're not going to force them to speak with somebody. I'm not going to drag somebody out of the pod … to talk to somebody they don't want to talk to.

---

[2] The Vernon County Jail is a "pod system." As described by Hoff, "There's essentially a master control bubble, and there's six general population pods where there are up to twenty inmates in each pod." The outside of each pod is lined with individual cells.

If the inmate elects to take the call, the floor officer then escorts the inmate seventy-five feet to the program room. The inmate is not handcuffed at any point during this process.

¶18 The program room is a multipurpose room approximately fifteen feet long and twenty-five feet wide, with its walls made of observation glass. It is carpeted and contains tables, chairs and a phone with an unrecorded line. The program room is equipped for remote court appearances and is used for the jail library.

¶19 Once the floor officer and the inmate arrive at the program room, the floor officer makes the outbound phone call, connects it, and then gives the phone to the inmate. At that point, the floor officer leaves the program room, locking the door. Outside of the program room, the floor officer continues to observe the inmate through the observation glass to make sure the inmate is "still on the phone [and] not touching any of the video equipment." Hoff reiterated that although the officer observes the inmate, no one listens to the inmate's conversation. When the floor officer sees the inmate hang up the phone, the officer opens the program room's door and escorts the inmate back to his or her pod.

¶20 The circuit court denied the State's motion for reconsideration. Although the court "certainly believe[d]" that Hoff knew "what he's talking about," it stated it was not going to presume that the jail's standard operating procedure was followed in this instance. The court explained, "Habit is habit, but … from there I'm not going to take the leap that [Hoff] can know exactly how this conversation went down. He may not have even been the officer that escorted [Halverson]. We don't know." The court concluded that there was "nothing compelling" in this case that would convince it to overturn the Wisconsin Supreme

7

Court's decisions in ***Schimmel v. State***, 84 Wis. 2d 287, 267 N.W.2d 271 (1978),[3] and ***Armstrong***. The court further stated it was "not convinced that our supreme court is necessarily going to go along with … [***Howes***]. [The Wisconsin Supreme Court] set up a bright line when the U.S. Supreme Court did not … and it's been almost a generation of well-settled law." The State now appeals the court's orders granting Halverson's suppression motion and denying its reconsideration motion.[4]

### DISCUSSION

¶21 In ***Miranda v. Arizona***, 384 U.S. 436 (1966), the United States Supreme Court held that the Fifth Amendment to the United States Constitution requires law enforcement officers to inform suspects in custody of their rights to remain silent and to have an attorney present before they are interrogated. ***Id.*** at 458. Both parties appear to agree that Danielson interrogated Halverson, as neither party argues to the contrary on appeal. Therefore, the issue presented is whether Halverson was in custody for purposes of ***Miranda*** when Danielson interrogated him.

¶22 Whether an individual is in custody for purposes of ***Miranda*** is a question of constitutional fact that we review under a two-part standard. ***State v. Bartelt***, 2018 WI 16, ¶25, 379 Wis. 2d 588, 906 N.W.2d 684. We will uphold the

---

[3] ***Schimmel v. State***, 84 Wis. 2d 287, 267 N.W.2d 271 (1978), was later overruled on grounds unrelated to this appeal by ***Steele v. State***, 97 Wis. 2d 72, 294 N.W.2d 2 (1980).

[4] This appeal was converted from a one-judge appeal to a three-judge appeal by the February 4, 2019 order of the Chief Judge of the Court of Appeals. *See* WIS. STAT. § 752.31(3) (2017-18); WIS. STAT. RULE 809.41(3) (2017-18).

All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

circuit court's findings of historical fact unless they are clearly erroneous. *Id.* However, whether those findings support a determination of custody for purposes of *Miranda* is a question of law that we independently review. *Id.*

¶23 The State renews its argument that Halverson was not in custody for *Miranda* purposes merely because he was incarcerated at the time of Danielson's questioning, asserting that the Supreme Court in *Howes* overruled Wisconsin's per se custody rule announced in *Armstrong*. The State contends *Howes* held that courts must undertake a totality-of-the-circumstances analysis to determine whether an individual was in custody when interrogated by law enforcement, even when that individual is presently incarcerated. In the State's view, Halverson was not in custody under the totality of the circumstances.

¶24 As explained more fully below, Wisconsin's per se custody rule announced in *Armstrong* was created by interpreting federal constitutional law. As such, we must assess whether *Armstrong*'s interpretation of federal constitutional law conflicts with the Supreme Court's decision in *Howes*. We conclude that such a conflict exists for purposes of interpreting the Fifth Amendment. Accordingly, we must analyze whether Halverson was in custody for purposes of *Miranda* in accordance with *Howes*'s totality-of-the-circumstances test unless the Wisconsin Constitution grants him greater protections than the Fifth Amendment provides.

¶25 To that end, Halverson invites us to interpret the Wisconsin Constitution's analog to the Fifth Amendment—article I, section 8—as providing greater protection of the right against self-incrimination so as to retain *Armstrong*'s per se custody rule as a matter of state constitutional law. For the reasons stated below, we decline to do so.

9

*I. **Armstrong**, **Howes**, and Federal and State Constitutional Protections Against Self-Incrimination*

¶26     As a threshold matter, our analysis of whether ***Armstrong*** survives ***Howes*** depends on whether the per se custody rule in ***Armstrong*** was derived from the Fifth Amendment to the United States Constitution or the Fifth Amendment's analog in article I, section 8 of the Wisconsin Constitution. Wisconsin courts normally interpret article I, section 8 of the Wisconsin Constitution "consistent with the Supreme Court's interpretation of the Fifth Amendment." ***Bartelt***, 379 Wis. 2d 588, ¶30. Our supreme court, however, has recognized rare exceptions to that rule, explaining that it "will not be bound by the minimums which are imposed by the Supreme Court … if … the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." ***State v. Knapp***, 2005 WI 127, ¶59, 285 Wis. 2d 86, 700 N.W.2d 899 (hereinafter, ***Knapp II***) (quoting ***State v. Doe***, 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977)).

¶27     The State asserts that ***Armstrong***'s per se custody rule was created solely by interpreting the Fifth Amendment. Halverson does not dispute this notion. Indeed, a review of ***Armstrong*** manifestly proves the State's assertion. Halverson instead argues that we should now interpret the Wisconsin Constitution "to preserve the longstanding bright-line rule that incarceration alone amounts to ***Miranda*** custody"—i.e., conclude that the Wisconsin Constitution affords our citizens greater protections than the Fifth Amendment.

¶28     In ***Armstrong***, which was decided in 1999, one issue before our supreme court was the admissibility of oral statements that Tonnie Armstrong made before receiving the ***Miranda*** warnings. ***Armstrong***, 223 Wis. 2d at 336. While Armstrong was incarcerated in a county jail, two police officers questioned

him in person about a recent homicide in the area. *Id.* at 338. The officers had information that Armstrong "may have witnessed something" that would have assisted the officers' investigation. *Id.* Neither officer read Armstrong his *Miranda* warnings at the beginning of the interview, and one officer later testified that the officers did not suspect Armstrong was involved in the crime when they initially talked with him. *Id.* Armstrong eventually made oral statements incriminating himself in the homicide. *Id.* at 335.

¶29 Our supreme court determined that Armstrong was in custody for purposes of *Miranda*. *Id.* at 354-55. The court relied upon *Mathis v. United States*, 391 U.S. 1 (1968), and "its Wisconsin counterpart," *Schimmel v. State*, 84 Wis. 2d 287, 267 N.W.2d 271 (1978), *overruled on other grounds by Steele v. State*, 97 Wis. 2d 72, 294 N.W.2d 2 (1980). *Armstrong*, 223 Wis. 2d at 353. Recognizing *Schimmel*'s reliance on *Mathis*, the court held:

> [A] person who is incarcerated is *per se* in custody for purposes of *Miranda*. Under *Mathis* and *Schimmel*, the reason that a person was incarcerated is irrelevant to a determination of whether he or she was in custody…. Indeed, we can think of no situation in which a defendant is more clearly in custody, as envisioned by the *Miranda* Court, than when the defendant is confined in a prison or jail.

*Id.* at 355-56 (footnote and citation omitted).

¶30 In 2012, the Supreme Court in *Howes* reversed a Sixth Circuit decision that had held that an inmate's isolation from the general prison population, combined with questioning about conduct occurring outside prison, "makes any such interrogation custodial *per se*." *Howes*, 565 U.S. at 504-05. The Court observed that it was "abundantly clear" that its precedents did "not clearly establish the categorical rule on which the Court of Appeals relied." *Id.* at 505. In

fact, the Court found that it had "repeatedly declined to adopt any categorical rule with respect to whether the questioning of a prison inmate is custodial." ***Id.***

¶31 Similar to our Wisconsin cases of ***Armstrong*** and ***Schimmel***, *see Armstrong*, 223 Wis. 2d at 354-55; ***Schimmel***, 84 Wis. 2d at 294-95, the Supreme Court noted that the Sixth Circuit "placed great weight" on the Court's decision in ***Mathis***, *see **Howes***, 565 U.S. at 506. In ***Mathis***, the Supreme Court rejected a federal court of appeals' holding that ***Miranda*** did not apply to an inmate's interview with an Internal Revenue Service agent at a prison. ***Id.*** at 506-07 (citing ***Mathis***, 391 U.S. at 4). The federal appeals court in ***Mathis*** had concluded that ***Miranda*** did not apply to the prisoner "for two reasons: A criminal investigation had not been commenced at the time of the interview, and the prisoner was incarcerated for an 'unconnected offense.'" ***Id.*** (citing ***Mathis v. United States***, 376 F.2d 595, 597 (5th Cir. 1967)).

¶32 ***Howes*** observed that "the holding in ***Mathis*** is simply that a prisoner who otherwise meets the requirements for ***Miranda*** custody is not taken outside the scope of ***Miranda*** by either of the two factors on which the Court of Appeals had relied." ***Id.*** at 507. Critically, the ***Howes*** Court concluded: "***Mathis*** did not hold that imprisonment, in and of itself, is enough to constitute ***Miranda*** custody." ***Id.*** Instead, the test for whether a person is in custody is an objective, two-part inquiry in which courts analyze the totality of the circumstances surrounding the interrogation. *See **id.*** at 509; *see also **Bartelt***, 379 Wis. 2d 588, ¶31.

¶33 In light of ***Howes***, we are compelled to disregard ***Armstrong***'s per se custody rule given its dependence solely on Fifth Amendment jurisprudence.[5] ***Armstrong*** cited ***Mathis*** as support for its holding that incarceration is custody per se for ***Miranda*** purposes. ***Armstrong***, 223 Wis. 2d at 355-56. ***Howes***, however, unambiguously concluded that ***Mathis*** cannot be read to have held as such. ***Howes***, 565 U.S. at 507. We are cognizant that only our supreme court can "overrule, modify, or withdraw language" from its prior cases. ***Cook v. Cook***, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Yet, under certain circumstances, we are permitted to define and recognize developments in the law. *See id.* at 188.

¶34 This case presents one of those occasions, as we "must not follow" a decision from our supreme court "on a matter of federal law if it conflicts with a subsequent controlling decision of the United States Supreme Court." ***State v. Jennings***, 2002 WI 44, ¶19, 252 Wis. 2d 228, 647 N.W.2d 142. Instead, we must "necessarily adhere to [a] subsequent United States Supreme Court decision, although it means deviating from the conflicting earlier decision of [the Wisconsin Supreme Court]." ***Id.*** Because ***Armstrong*** relied solely upon federal law (***Mathis*** and the Fifth Amendment) to create its per se custody rule, which rule ***Howes*** later recognized was incorrect, we conclude the circuit court erred by following ***Armstrong*** instead of ***Howes*** to conclude that Halverson was in custody per se for purposes of ***Miranda***.

---

[5] We observe that our supreme court in ***State v. Hanson***, 2019 WI 63, 387 Wis. 2d 233, 928 N.W.2d 607, has recently recognized the holding in ***Howes v. Fields***, 565 U.S. 499 (2012). ***Hanson***'s statement that ***Howes*** "recently clarified [that a] 'service of a term of imprisonment, without more, is not enough to constitute ***Miranda*** custody,'" ***Hanson***, 387 Wis. 2d 233, ¶35, lends further support to our conclusion that ***State v. Armstrong***, 223 Wis. 2d 331, 588 N.W.2d 606 (1999), misinterpreted prior federal case law.

¶35    Irrespective of ***Armstrong***'s clear reliance on Fifth Amendment jurisprudence, Halverson argues that we should now interpret the Wisconsin Constitution to provide greater protection of the right against compelled self-incrimination than what is afforded to individuals under the Fifth Amendment. He first relies upon ***Knapp II*** for support, contending that case "provides a useful example" as to when our supreme court has interpreted article I, section 8 of the Wisconsin Constitution to afford greater protections than the Fifth Amendment.

¶36    Our supreme court decided ***Knapp II*** on remand from the United States Supreme Court. ***Knapp II***, 285 Wis. 2d 86, ¶1. Matthew Knapp was a person of interest in a homicide investigation of a woman who had been beaten to death. *See id.*, ¶¶3, 5. Detective Timothy Roets went to Knapp's apartment to arrest Knapp on a probation apprehension request. *Id.*, ¶7. When Knapp saw Roets at his door, Knapp attempted to call his attorney. *Id.* Knapp eventually hung up the phone, let Roets into the apartment, and told Roets that he had been attempting to contact his attorney. *Id.* Roets informed Knapp that he had to go to the police station, but Roets never read Knapp ***Miranda*** warnings. *Id.* While Knapp put on his shoes in his bedroom, Roets asked Knapp where his clothes were that he had been wearing the prior evening (when Knapp was with the victim). *Id.*, ¶8. Knapp pointed to a pile of clothing on the floor, which Roets immediately seized. *Id.*

¶37    Roets continued to question Knapp once they were at the police station, but Roets still had not given Knapp the ***Miranda*** warnings. *Id.*, ¶10. At one point, Knapp stated that he did not want to write or sign any statements, as he had been told previously by an attorney not to speak to police. *Id.* Knapp eventually began to discuss what occurred on the night he was with the victim, but

it eventually dawned on him that he was being questioned as a suspect to the crime, rather than as a witness. *Id.* The questioning stopped after Knapp again stated that he would not write or sign a statement without an attorney. *Id.*

¶38 Knapp was neither arrested nor charged at that time, and over twelve years passed before he was eventually arrested and charged for the victim's death. *Id.*, ¶¶11, 13. During that time, new witnesses implicated Knapp in the murder. *Id.*, ¶12. In addition, investigators retested Knapp's clothing using more modern DNA tests. *Id.* While an analysis of Knapp's sweatshirt—which was part of the clothing Roets collected—previously indicated the victim could not be excluded as the source of blood present on his sweatshirt, the more recent DNA test established that the blood on Knapp's sweatshirt in fact belonged to the victim. *Id.* Knapp subsequently moved to suppress, among other things, the sweatshirt containing the victim's blood because it was "the illegal fruit of a *Miranda* violation." *Id.*, ¶13.

¶39 Roets testified at the suppression hearing, and his testimony made it clear that he was aware of the *Miranda* requirement and purposefully chose not to give the warnings so "he could keep the lines of communication open" with Knapp. *Id.*, ¶14. In other words, Roets "abandoned the notion of reading [Knapp] his constitutional rights" because Roets knew Knapp wanted an attorney, but he believed Knapp would have exercised his rights and might not have made a statement if Roets *Mirandized* him. *Id.* Our supreme court held that the physical evidence obtained as a direct result of a *Miranda* violation was inadmissible when the violation was an intentional attempt to prevent the suspect from exercising Fifth Amendment rights. *State v. Knapp*, 2003 WI 121, ¶79, 265 Wis. 2d 278, 666 N.W.2d 881 (hereinafter, *Knapp I*).

15

¶40    Following ***Knapp I***, the Supreme Court decided ***United States v. Patane***, 542 U.S. 630 (2004), in which a Court plurality concluded that law enforcement's failure to give a suspect ***Miranda*** warnings did not require suppression of physical evidence obtained in connection with the suspect's unwarned but voluntary statements. *See **Patane***, 542 U.S. at 636-37. In light of ***Patane***, the Supreme Court vacated ***Knapp I*** and remanded the case to our supreme court to reconsider its decision in light of the principles articulated in ***Patane***. ***Knapp II***, 285 Wis. 2d 86, ¶1.

¶41    ***Knapp II*** arrived at a similar conclusion to that of ***Knapp I***, ***Patane*** notwithstanding. This time, relying upon separate, adequate and independent state law grounds—namely, article I, section 8 of the Wisconsin Constitution—our supreme court concluded that our state constitution permitted the suppression of physical evidence obtained "as the direct result of an intentional ***Miranda*** violation." ***Id.***, ¶2 & n.3. While reiterating that the exclusionary rule is not absolute, the court found exclusion was proper in ***Knapp II*** because there was a "strong need for deterrence" that overcame the societal costs of excluding evidence. ***Id.***, ¶74. The court found the police conduct at issue was "intentional," "particularly repugnant," and "the type of conduct that ***Miranda*** was designed to prevent." ***Id.***, ¶75. The court also determined that "judicial integrity" required exclusion, explaining that the judicial process is "systemically corrupted" if there are not protections in place to deter law enforcement from taking "unwarranted investigatory shortcuts to obtain convictions." ***Id.***, ¶¶79, 81.

¶42    Halverson argues "considerations of fairness and logic" dictate that, like the court in ***Knapp II***, we should conclude that our state constitution grants greater protections than those afforded by the Fifth Amendment. As a result, he argues the ***Armstrong*** per se custody rule survives ***Howes*** based on independent

and adequate state grounds. *Cf. id.*, ¶2 n.3 (recognizing that decisions interpreting our state constitution can provide Wisconsin citizens stronger protections than those afforded under the United States Constitution when relying upon separate, adequate and independent state grounds). We disagree for a number of reasons.

¶43   First, Halverson's argument in this regard is largely conclusory. The supreme court in ***Knapp II*** underwent an extensive comparative analysis to determine that it was permitted to impose greater protections under our state constitution than those protections that the Supreme Court has imposed under the United States Constitution. Halverson makes no attempt to do the same type of comparative analysis here. Rather, he merely argues that because our constitution has at least once been interpreted previously to grant greater protections than the Fifth Amendment, we should follow suit here. His argument is unpersuasive because Halverson never explains how the language of article I, section 8 of the Wisconsin Constitution supports the per se custody rule, which is important given that ***Armstrong*** relied upon federal case law interpreting the United States Constitution to create that rule.

¶44   Second, Halverson's reliance on ***Knapp II*** is misplaced because ***Knapp II*** is neither legally nor factually analogous to Halverson's case. ***Knapp II*** relied upon, in part, prior Wisconsin cases interpreting the breadth of the exclusionary rule under article I, section 8 of the Wisconsin Constitution. *See **Knapp II***, 285 Wis. 2d 86, ¶¶63-69. Neither Halverson nor ***Armstrong*** explains how article I, section 8 specifically grants greater protections for inmates than does the Fifth Amendment. Additionally, while Halverson recognizes the "strong need for deterrence" of the intentional police misconduct at the heart of ***Knapp II***'s holding, he never suggests that Danielson's conduct here was the type of egregious, bad-faith police misconduct seen in ***Knapp II***. Indeed, there is

17

nothing in the record to suggest that Danielson's failure to *Mirandize* Halverson was a willful attempt to sidestep the *Miranda* requirements.

¶45 Third and finally, we disagree with Halverson's assertions that "[c]onsiderations of fairness and logic" provide support for preserving the per se custody rule. Citing *Miranda*, Halverson suggests incarceration is the most obvious form of custody due to its "inherently compelling pressures," *Miranda*, 384 U.S. at 467, and he argues it would defy common sense to conclude an inmate in a prison or jail is not in the kind of custody that warrants *Miranda* warnings. As the State aptly recognizes in its reply, however, "Halverson presents no explanation why … the totality-of-the-circumstances assessment … in [*Howes*] inadequately protects his or any incarcerated defendant's rights against self-incrimination, such that preserving *Armstrong*'s bright-line … rule is warranted."

¶46 Moreover, *Howes* directly dismisses Halverson's argument on this point. There, the Court stated: "*Miranda* did not hold that such pressures are always present when a prisoner is taken aside and questioned about events outside the prison walls. Indeed, *Miranda* did not even establish that police questioning of a suspect at the station house is always custodial." *Howes*, 565 U.S. at 507-08 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The Court, observing it previously held in *Maryland v. Shatzer*, 559 U.S. 98, 110-15 (2010), "that a break in custody may occur while a suspect is serving a term in prison," concluded that it then "must follow that imprisonment alone is not enough to create a custodial

18

situation within the meaning of *Miranda*."[6]  *Howes*, 565 U.S. at 510-11.  Lacking a compelling argument from Halverson to the contrary, we agree with this analysis.

¶47    In sum, we decline Halverson's invitation to interpret article I, section 8 of the Wisconsin Constitution more broadly than the Fifth Amendment in this context.  Halverson fails to explain how our constitution could be construed to adopt *Armstrong*'s per se custody rule, which is particularly problematic when *Armstrong* relied upon cases interpreting the Fifth Amendment to create that rule.  Halverson's reliance on *Knapp II* is not persuasive, given the different legal doctrines and facts it analyzed.  Finally, we disagree that "considerations of fairness and logic" dictate a per se custody rule whenever an individual is interrogated within a jail or prison, especially in light of the rationale in *Howes*.

## II.  *Halverson Was Not in Custody for* Miranda *Purposes*

¶48    Although we conclude that Halverson was not in custody at the time of his telephone call with Danielson merely because of his incarceration, the question remains as to whether Halverson was in custody for *Miranda* purposes using the framework outlined by *Howes*.  As *Howes* teaches, we must analyze the totality of the circumstances surrounding Danielson's interrogation of Halverson. *See Howes*, 565 U.S. at 509; *Bartelt*, 379 Wis. 2d 588, ¶31.

---

[6] The Court explained that there were "at least three strong grounds" to support its conclusion on this point.  *Howes*, 565 U.S. at 511.  We explain these grounds later in our analysis, *see infra*, ¶¶57-59, when we assess whether the environment surrounding Halverson's interrogation presented "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *State v. Bartelt*, 2018 WI 16, ¶33, 379 Wis. 2d 588, 906 N.W.2d 684 (quoting *Howes*, 565 U.S. at 509).

¶49 A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Bartelt*, 379 Wis. 2d 588, ¶31 (quoting *Miranda*, 384 U.S. at 444). "[C]ustody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes*, 565 U.S. at 508-09. The test for determining custody is an objective one. *See id.* at 509; *Bartelt*, 379 Wis. 2d 588, ¶31.

¶50 The first step is to determine whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Howes*, 565 U.S. at 509; *Bartelt*, 379 Wis. 2d 588, ¶31. While we must examine all of the circumstances surrounding the interrogation in their totality, specific relevant factors include: the degree of restraint; the purpose, place and length of the interrogation; and what has been communicated by law enforcement officers to the defendant. *Bartelt*, 379 Wis. 2d 588, ¶32. When assessing the degree of restraint, we consider whether the defendant was handcuffed, whether law enforcement officers had their weapons drawn, and the number of officers involved, among other factors not relevant to the present case. *See id.*

¶51 If we conclude that a defendant's freedom of movement was objectively curtailed, we must next determine whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*, ¶33 (quoting *Howes*, 565 U.S. at 509). "In other words, we must consider whether the specific circumstances presented a serious danger of coercion, because the 'freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.'" *Id.* (quoting *Howes*, 565 U.S. at 509).

¶52     Before we can assess the totality of the circumstances here, we first must address a point of contention regarding our use of Hoff's testimony. Halverson asserts that, in the context of the analysis to follow, we should not rely upon Hoff's testimony regarding the jail's standard procedures and practices to determine the actual conditions during his telephone call with Danielson. Halverson contends that Hoff's testimony is speculative because the State could not produce a witness who could remember the specific circumstances Halverson experienced.  Thus, in Halverson's view, Hoff's testimony amounted to only "theorizing and conjecturing," upon which the State could not rely to meet its prima facie burden of proof.  We disagree.

¶53     Hoff's testimony was neither "theorizing" nor "conjecturing," such that his testimony would be unreliable as a matter of law.  Evidence of a routine *is* evidence.  Hoff testified to having firsthand knowledge of the jail's standard operating procedures and of working on the day Halverson and Danielson's conversation took place.  Evidence of a routine practice is relevant to prove that a person or organization conformed to that practice. *See* WIS. STAT. § 904.06(1). Furthermore, Halverson failed to rebut any of Hoff's testimony.  Generally speaking, "[p]ositive uncontradicted testimony as to the existence of some fact, or the happening of some event, cannot be disregarded by a court … in the absence of something in the case which discredits the same or renders it against the reasonable probabilities." ***Thiel v. Damrau***, 268 Wis. 76, 85, 66 N.W.2d 747 (1954).  In addition, the circuit court found credible the testimony of Hoff (and Danielson).  The court is the ultimate arbiter of witness credibility in this instance. *See* ***State v. Sloan***, 2007 WI App 146, ¶21, 303 Wis. 2d 438, 736 N.W.2d 189.

Given these principles, it is proper for us to rely upon Hoff's testimony when determining whether Halverson was in custody for purposes of *Miranda*.[7]

¶54    Halverson claims that even though the circuit court found Hoff to be credible, it nonetheless chose to disregard his testimony. Halverson points to the court's statement that it was "not going to take the leap that [Hoff] can know exactly how this conversation went down. He may not have even been the officer that escorted [Halverson]. We don't know." Consequently, Halverson argues that we cannot rely upon Hoff's testimony.

¶55    Halverson's argument in this regard is undeveloped, as he does not directly explain why we should disregard Hoff's testimony when the circuit court found Hoff credible, but it then declined to consider his testimony regarding the jail's standard operating procedures. Instead, he simply argues that we should ignore the court's credibility finding and Hoff's testimony altogether. We could, therefore, deem his argument forfeited. *See M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244-45, 430 N.W.2d 366 (Ct. App. 1988).

¶56    Nonetheless, Halverson has never challenged Hoff's description of the jail's standard operating procedures, nor has he claimed that they were not followed in this instance. Indeed, there is no evidence to the contrary. Under these circumstances, the circuit court was required, as a matter of law, to accept

---

[7] In this regard, it is important to remember that Hoff's testimony only went to: (1) the jail's standard procedures for such phone calls; and (2) Hoff's inability to recall any deviation from those procedures or anything otherwise unusual happening on the day of the call between Halverson and Danielson. This evidence—while certainly not dispositive of "exactly how this conversation went down," as the circuit court stated—is plainly material to our independent decision of whether the available facts support a determination of custody for purposes of *Miranda*.

Hoff's testimony as to routine—including the only reasonable inferences to flow from that testimony—especially in light of the court finding him a credible witness. *See* ***Thiel***, 268 Wis. at 85.[8] While we acknowledge that no one else testified as to what specifically happened that day (other than Danielson, who was not physically present at the jail), the absence of such testimony in no way prohibits a court's reliance on credible testimony regarding routine practices.

¶57 Moving then to our analysis of the totality of the circumstances, we first note that "[t]here are at least three strong grounds" for ***Howes***'s conclusion that "imprisonment alone is not enough to create a custodial situation within the meaning of ***Miranda***." ***Howes***, 565 U.S. at 511. First, the questioning of a person who is already incarcerated "does not generally involve the shock that very often accompanies arrest." ***Id.*** An individual arrested in his or her home or on the street and then taken to the police station for questioning, on the other hand, encounters a much more coercive atmosphere due to the "sharp and ominous change," the shock of which may give rise to coercive pressures. ***Id.***

¶58 Second, an inmate, "unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for a prompt release." ***Id.*** The inmate knows that when the questioning ceases, he or she will remain under confinement. ***Id.*** In contrast, individuals who are arrested and taken to the station house for questioning may feel pressured to speak because, if they do, they may be allowed to leave and go home. ***Id.***

---

[8] In fairness to the circuit court, the record illustrates that the court likely disregarded Hoff's testimony because it thought his testimony was immaterial to determining custody under the per se custody rule found in ***Armstrong***.

¶59    Finally, an inmate, "unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him [or her] probably lack the authority to affect the duration of [the inmate's] sentence," such as by bringing about an early release if the possibility of parole exists. *Id.* at 512. There is thus little "basis for the assumption that a suspect will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of a more lenient treatment should he [or she] confess." *Id.* (quoting *Illinois v. Perkins*, 496 U.S. 292, 296-97 (1990)). "In short, *standard conditions of confinement and associated restrictions* on freedom will not necessarily implicate the same interests that the Court sought to protect when it afforded special safeguards to persons subjected to custodial interrogation." *Id.* (emphasis added).

¶60    With the foregoing considerations in mind, we conclude that, under the facts of this case, Halverson was not in custody for purposes of *Miranda* because a reasonable person in his position would have felt free to terminate the interrogation and end the phone call. The call's duration was short, lasting only three to four minutes. Danielson never raised his voice at or threatened Halverson, and at no point did Halverson request an attorney or express that he wanted to end the call. Although Halverson was isolated from the general jail population and locked inside the program room, he was alone and unrestrained. Further, the program room itself had no characteristics that would provide discomfort to Halverson such that it would materially add to any unduly coercive atmosphere he claims to have faced during the interrogation.

¶61    Importantly, Halverson was not forced to take the call with Danielson or prevented from disconnecting it. Halverson was given the choice to return Danielson's call. He was capable of hanging up the phone at any point during their conversation. In light of Halverson's ability to make such choices and

24

the other objective circumstances surrounding the interrogation, we conclude that a reasonable person in Halverson's position would have felt free to terminate the interrogation—i.e., end the phone call with Danielson and request to return to his cell.

¶62     Halverson argues that even under the totality of the circumstances, he was in custody for purposes of *Miranda* because Danielson never informed Halverson that he was free to end the call.  Halverson correctly notes that, in *Howes*, the Court relied heavily on the fact that the inmate was told at the outset of the interrogation that he could leave and go back to his cell whenever he wanted.  *See Howes*, 565 U.S. at 515.  Significantly, however, the interrogation that occurred in *Howes* was conducted in person.  *See id.*

¶63     While we agree that law enforcement's failure to inform an individual that he or she may end an interrogation is a fact that weighs in favor of an individual being in custody for purposes of *Miranda*, we view that fact as less critical when the interrogation occurs by telephone.  *See State v. Mills*, 2012 UT App 367, ¶¶17-24, 293 P.3d 1129.  As the State explains, many other courts have observed the fact that an interrogation conducted by telephone tends to make the interrogation less likely to be custodial.  *See, e.g.*, *Pasdon v. City of Peabody*, 417 F.3d 225, 227-28 (1st Cir. 2005); *People v. J.D.*, 989 P.2d 762, 771-72 (Colo. 1999); *Bradley v State*, 449 S.E.2d 492, 494 (S.C. 1994); *Commonwealth v. Smallwood*, 401 N.E.2d 802, 806 (Mass. 1980); *State v. Denton*, 792 P.2d 537, 540 (Wash. Ct. App. 1990); *People v. Anthony*, 230 Cal. Rptr. 268, 273 (Ct. App. 1986).  While there may be circumstances in which an interrogation conducted by telephone can be coercive enough for a person to be deemed in custody for *Miranda* purposes, generally speaking, a law enforcement officer questioning someone by telephone is a fact that makes an alleged interrogation less likely to be

custodial for purposes of *Miranda*. Therefore, we are not convinced that Danielson's failure to inform Halverson of his ability to end the call created a custodial interrogation, especially in light of the other objective circumstances weighing against a finding of custody.

¶64 Finally, we note that the environment in which Halverson's interrogation took place was not unduly coercive because he experienced the "standard conditions of confinement and associated restrictions on freedom" felt by all inmates. *See Howes*, 565 U.S. at 512. The day Halverson and Danielson spoke was apparently unremarkable, as no witness appeared to specifically remember Halverson's phone call with Danielson. While Halverson attempts to portray the jail's standard operating procedures as "exactly the sort of psychologically coercive atmosphere the *Miranda* Court sought to restrain," his argument falters because any coercive pressures he claims to have experienced were no different from what inmates experience day-to-day in a jail or prison. As we have already explained, inmates are subjected to an inherently coercive atmosphere by virtue of their incarceration. *See supra*, ¶¶45-46, 57-59. Without additional facts indicating that Halverson was subject to a serious risk of coercion, standard conditions of confinement and their associated restrictions on freedom are not enough to constitute *Miranda* custody in this instance. *See Howes*, 565 U.S. at 509, 512.

## CONCLUSION

¶65 We hold that *Armstrong*'s per se custody rule for incarcerated individuals is no longer binding precedent because it relies upon an incorrect interpretation of federal cases applying the Fifth Amendment, as recognized by the

Supreme Court in ***Howes***. We also decline to maintain ***Armstrong***'s per se custody rule under article I, section 8 of the Wisconsin Constitution.

¶66     Accordingly, analyzing the totality of the circumstances surrounding Danielson's telephone interrogation of Halverson, we conclude that Halverson was not in custody for purposes of ***Miranda***. Danielson was consequently not constitutionally required to ***Mirandize*** Halverson, and the circuit court erred by concluding otherwise. We therefore reverse the circuit court's orders granting Halverson's motion to suppress and denying the State's motion for reconsideration, and we remand with directions to deny Halverson's suppression motion.

*By the Court.*—Orders reversed and cause remanded with directions.