# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP858-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, Plaintiff-Appellant, v. Brian L. Halverson, Defendant-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 389 Wis. 2d 554,937 N.W.2d 74
PDC No:2019 WI App 66 - Published

| | |
|---|---|
| OPINION FILED: | January 29, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 14, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Chippewa |
| JUDGE: | Steven R. Cray |

JUSTICES:

HAGEDORN, J., delivered the majority opinion for a unanimous Court. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *Megan Sanders-Drazen*, assistant state public defender. There was an oral argument by *Megan Sanders-Drazen*.

For the plaintiff-appellant, there was a brief filed by *Sarah L. Burgundy*, assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sarah L. Burgundy*.

No. 2018AP858-CR
(L.C. No. 2017CM83)

STATE OF WISCONSIN          :          IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Appellant,**

    **v.**

**Brian L. Halverson,**

    **Defendant-Respondent-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JAN 29, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion for a unanimous Court. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed and cause remanded to the circuit court with directions.*

¶1 BRIAN HAGEDORN, J. You have "a right to remain silent." Miranda v. Arizona, 384 U.S. 436, 444 (1966). So begins the ubiquitous Miranda warnings, procedural safeguards the United States Supreme Court has mandated must be administered to suspects prior to any "custodial interrogation." Id. If the warnings are not given, any statements made are inadmissible in court. Id.

¶2 The question in this case concerns the scope of "custody" for purposes of Miranda. The defendant, Brian L. Halverson, was an inmate in jail when he returned a call from an officer regarding an incident at Halverson's prior correctional institution. During the short call, the officer asked Halverson about an inmate's missing property, and Halverson admitted that he took and destroyed the property. No Miranda warnings were given. Halverson argues that his statements must be suppressed because he was in custody as an inmate in jail, and therefore he also was most assuredly "in custody" for purposes of Miranda.

¶3 In a 1999 case, this court agreed. State v. Armstrong, 223 Wis. 2d 331, 588 N.W.2d 606 (1999). Relying on United States Supreme Court precedent, we held "that a person who is incarcerated is per se in custody for purposes of Miranda." Id. at 355. In 2012, however, the United States Supreme Court clarified this is not what federal law requires. In Howes v. Fields, the Court concluded that the Constitution contains no such per se rule. 565 U.S. 499, 508 (2012). The Court emphasized that "custody" for purposes of Miranda is a term of art; it is not consonant with the inability to leave or with incarceration generally. Id. at 508-09. Whether a suspect was "in custody" depends on an inquiry of the totality of the circumstances, looking to the degree of restraint and coercive nature of the interrogation. Id. at 509.

¶4 Recognizing that the federal constitutional landscape does not support his argument, Halverson asks this court to readopt the per se rule, this time relying on the Wisconsin

2

Constitution. We decline Halverson's request. While this court need not always follow federal constitutional interpretation in lockstep, we conclude that neither the Wisconsin Constitution nor the purposes underlying the Miranda warnings support a judicially-created rule treating all incarcerated individuals as "in custody." In the alternative, Halverson contends that his incriminating statements should be suppressed because he was "in custody" under the traditional Miranda custody test. We disagree and conclude that Halverson was not in custody for purposes of Miranda.

## I. BACKGROUND

¶5 Brian L. Halverson was an inmate in the Vernon County Jail when Officer Matthew Danielson called and requested to speak with him. Officer Danielson was investigating a claim of theft and destruction of property at Stanley Correctional Institution that occurred when Halverson was incarcerated there. Halverson returned the call and admitted to the crimes. The State charged Halverson with one count of criminal damage to property and one count of misdemeanor theft, both as a repeater. Halverson filed a motion to suppress his statements in part on the grounds that he was not read his Miranda warnings.

¶6 During the suppression hearing, Officer Danielson testified that he called the Vernon County Jail the morning of September 27, 2016, and requested to speak to Halverson. He received a call back within ten minutes from a deputy at the jail who put Halverson on the phone. Officer Danielson began

3

the call by introducing himself, explaining the purpose of the call, and asking if Halverson knew the individuals who were involved in the incident at Stanley Correctional Institution. When questioned initially, Halverson stated that he believed the items were inadvertently placed in the garbage. But when asked about two letters admitting his guilt that Halverson wrote to the victim and another inmate, Halverson's tone shifted. While calm at the outset, Halverson began yelling. He ultimately admitted to Officer Danielson that he took and destroyed the property. The entire phone call lasted no more than five minutes. Officer Danielson testified that, for his part, his tone was calm and normal throughout the call. Halverson was not read his Miranda warnings, Officer Danielson explained, because while "he was in custody somewhere else for something else," Halverson was not "in custody with me."

¶7 The circuit court relied on Officer Danielson's uncontested testimony as factual background, but it granted Halverson's motion to suppress.[1] The circuit court concluded it was bound to apply Armstrong's per se rule that incarcerated individuals are in custody for Miranda purposes. The State moved for reconsideration.

---

[1] The Honorable Steven R. Cray, Chippewa County Circuit Court, presiding.

4

¶8 At the reconsideration hearing, Vernon County Sheriff's Deputy Matthew Hoff testified.[2] Deputy Hoff did not specifically remember the call. Instead, he testified regarding the standard operating procedures at the Vernon County Jail, testimony the circuit court accepted as credible.

¶9 When an inmate at the jail receives a phone call, the inmate can choose whether to take or return the call. If an inmate wishes to do so, a deputy escorts the inmate from his pod to the jail's community room. The community room is approximately 15-by-25-feet in size and doubles as the jail library. The deputies visually monitor the inmate through observation glass, but they cannot hear what occurs in the community room and the calls are not recorded. Once the call is complete, the inmate is escorted back to his pod. The inmate is not handcuffed at any point during this process.

¶10 Following the hearing, the circuit court denied the State's motion for reconsideration, once again concluding it was bound to follow the per se rule in Armstrong and suppress Halverson's statements.

¶11 The State appealed and the court of appeals reversed. The court of appeals held that the per se rule adopted by this court in Armstrong was effectively overruled by the United States Supreme Court in Howes, and it declined to readopt the

---

[2] Deputy Hoff was subpoenaed to appear at the initial suppression hearing, but he did not appear. The circuit court reserved the right for the parties to provide Deputy Hoff's testimony at a reconsideration hearing.

5

per se rule under the Wisconsin Constitution. State v. Halverson, 2019 WI App 66, ¶65, 389 Wis. 2d 554, 937 N.W.2d 74. It further concluded that Halverson was not in custody for purposes of Miranda under the totality of the circumstances. Id., ¶66. We granted Halverson's petition for review and agree with the court of appeals.

## II. DISCUSSION

¶12 The issues in this case center on the nature of "custody" for purposes of determining whether Miranda warnings must be administered. Halverson contends he was in custody for two independent reasons. First, Halverson argues all incarcerated individuals should be deemed "in custody" for purposes of Miranda solely due to their incarceration. Although the United States Supreme Court rejected a per se rule to this effect, he asks us to adopt this approach under the Wisconsin Constitution. Second, if we decline that request (as we do), Halverson asserts the totality of the circumstances nonetheless demonstrates he was in custody for purposes of Miranda. We begin with the constitutional backdrop underlying these claims, and then address the merits of each in turn.

## A. The Law of Miranda

¶13 The Fifth Amendment of the United States Constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In Miranda, the Supreme Court created a

6

set of procedural safeguards, enforced by the remedy of exclusion, aimed at "protecting a defendant's Fifth Amendment privilege against self-incrimination." Withrow v. Williams, 507 U.S. 680, 691 (1993). These safeguards were proposed in response to four cases consolidated before the Court. Miranda, 384 U.S. at 491-99. All four concerned the questioning of a defendant by a law enforcement officer, detective, or district attorney in a police station where the defendant was isolated from the outside world and eventually orally admitted to the underlying crime after at least two hours of questioning. Id. at 491-98.

¶14 The Court has explained that these warnings, and the evidentiary penalty for failing to administer them, constitute a prophylactic rule that extends beyond the requirements of the constitutional text itself. See Oregon v. Elstad, 470 U.S. 298, 306 (1985) ("The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation."). Instead, Miranda is a judicially instituted effort to protect against self-incrimination by creating an unrebuttable legal presumption of coercion whenever the warnings are not administered. Id. at 306 n.1 ("A Miranda violation does not constitute coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements.").

¶15 This anti-coercion objective is central to understanding the reach and limits of the Miranda requirements.

7

This goal explains why the Court established what it called "custodial interrogation" as the trigger for administration of these warnings. <u>Miranda</u>, 384 U.S. at 444 ("[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."). The issues before us center on what makes an interrogation "custodial."

¶16 The United States Supreme Court has made clear that "custody" for purposes of <u>Miranda</u> is not equivalent to a dictionary definition of the term.[3] Rather, "custody" in the context of <u>Miranda</u> "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." <u>Howes</u>, 565 U.S. at 508-09.

¶17 The <u>Miranda</u> custody analysis proceeds in two steps. First, courts "ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>Id.</u> at 509 (alteration in original) (quoted sources omitted). This requires examining the totality of the circumstances, including relevant factors such as "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the

---

[3] Colloquially, "custody" is defined as "[t]he state of being detained or held under guard, especially by the police." <u>Heritage Dictionary of the English Language</u> 462 (3d ed. 1992).

8

interviewee at the end of the questioning." Id. (citations omitted). The inability to leave and terminate the conversation, however, is not enough on its own to trigger the need for Miranda warnings. Id. This inquiry "is simply the first step in the analysis, not the last." Id. "[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, 559 U.S. 98, 112 (2010). Instead, courts proceed to the second step in the custody analysis where they ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Howes, 565 U.S. at 509.

B. Incarceration and "Custody" Under Federal Law

¶18 Application of these principles in the context of incarceration has not always been clear. In 1999, this court addressed whether an inmate should have received Miranda warnings when questioned for an offense unrelated to his incarceration. Armstrong, 223 Wis. 2d 331. We examined federal cases and our cases interpreting federal precedent and held "that a person who is incarcerated is per se in custody for purposes of Miranda." Armstrong, 223 Wis. 2d at 355.

¶19 In 2012, however, the United States Supreme Court reached the opposite conclusion. Howes, 565 U.S. at 508. In that case, the defendant was in jail when escorted to a conference room where two armed sheriff's deputies questioned him for between five and seven hours about allegations pre-

9

dating his time in prison. Id. at 503. Fields was uncuffed and told several times that he could leave and return to his cell. Id. The door to the conference room was open and shut at different times during the questioning. Id. Fields ultimately confessed. Id. At no point during the questioning, however, was he read his Miranda warnings. Id. at 504.

¶20 On these facts, the Court expressly rejected a categorical rule that questioning an inmate is custodial. Id. at 505. Instead it reviewed and re-emphasized the two-step, totality-of-the-circumstances custody inquiry established in prior cases. Id. at 509. Using that analysis, it reasoned that incarcerated individuals are not automatically in custody for purposes of Miranda. Id. The Court offered three reasons to support its conclusion——all centering on whether the environment necessarily contains the same coercive pressures that animated the Court's holding in Miranda. Id. at 511-12. First, questioning an incarcerated person does not involve the same kind of shock accompanying someone arrested in the first instance, and therefore the coercive pressures are substantially diminished. Id. at 511. Second, incarcerated individuals have far less pressure to speak with the hope of securing release. Id. They know that when the questioning is finished, they will remain incarcerated. Id. Finally, incarcerated individuals know that their questioners "probably lack authority to affect the duration of [their] sentence." Id. at 512. Therefore, the Court held that incarceration alone does not necessarily

10

implicate the same anti-coercion interests that motivated the Court's prophylactic efforts in Miranda. Id.[4]

¶21 In this case, the court of appeals correctly deduced that it was bound to follow the United States Supreme Court's decision in Howes rather than our earlier decision in Armstrong. Halverson, 389 Wis. 2d 554, ¶34. As we explained in State v. Jennings, "The court of appeals must not follow a decision of this court on a matter of federal law if it conflicts with a subsequent controlling decision of the United States Supreme Court." 2002 WI 44, ¶19, 252 Wis. 2d 228, 647 N.W.2d 142. Accordingly, we recognize that the Court's decision in Howes functionally overruled Armstrong's per se rule.

C. Incarceration and "Custody" Under the Wisconsin Constitution

¶22 Bereft of a per se determination that incarceration produces Miranda custody under federal law, Halverson asks us to adopt a per se rule in reliance on the Wisconsin Constitution. Constitutional interpretation is a question of law we review independently. Serv. Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35. In interpreting the

---

[4] Three justices dissented in part. The partial dissent did not object to the majority's analysis rejecting a per se rule. Howes v. Fields, 565 U.S. 499, 517 (2012) (Ginsburg, J., concurring in part and dissenting in part). Rather, it asserted that Miranda warnings should have been given to this particular suspect because he was "subjected to 'incommunicado interrogation . . . in a police-dominated atmosphere.'" Id. at 518. Thus, even the partial dissent aimed its analysis at honoring "the Fifth Amendment privilege Miranda was designed to safeguard." Id. at 519.

11

Wisconsin Constitution, we focus on the language of the adopted text and historical evidence including "the practices at the time the constitution was adopted, debates over adoption of a given provision, and early legislative interpretation as evidenced by the first laws passed following the adoption." Id., ¶28 n.10.

¶23 While we must follow the United States Supreme Court on matters of federal law, we have an independent responsibility to interpret and apply the Wisconsin Constitution. Jennings, 252 Wis. 2d 228, ¶¶18, 38. Fulfilling our duty to uphold the Wisconsin Constitution as written could yield conclusions affording greater protections than those provided by the federal Constitution. State v. Doe, 78 Wis. 2d 161, 171, 254 N.W.2d 210 (1977).

¶24 That said, this court has underscored that any argument based on the Wisconsin Constitution must actually be grounded in the Wisconsin Constitution. State v. Roberson, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813 ("[T]he question for a state court is whether its state constitution actually affords greater protection."); Jennings, 252 Wis. 2d 228, ¶¶38-39 (explaining that any upward departure from the standards based on the federal Constitution announced by the Supreme Court "must itself be grounded in requirements found in the state constitution or laws"). "A state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning." Roberson, 389 Wis. 2d 190, ¶56.

12

¶25 Halverson recognizes that <u>Miranda</u> warnings are a prophylactic tool fashioned to protect the privilege against self-incrimination, a right independently protected in both constitutions.  Halverson therefore asks this court to create an expanded prophylactic to protect a person's rights under the Wisconsin Constitution.[5]

¶26 The self-incrimination clause of Article I, Section 8(1), adopted before incorporation of federal protections against the states via the Fourteenth Amendment, is substantively identical to the Fifth Amendment.  It provides in relevant part:  "No person . . . may be compelled in any criminal case to be a witness against himself or herself."  Wis. Const. art. I, § 8(1).[6]  We have generally interpreted Article I, Section 8 consistent with the protections afforded by the Fifth Amendment.  <u>State v. Bartelt</u>, 2018 WI 16, ¶30, 379 Wis. 2d 588, 906 N.W.2d 684.[7]  Halverson provides no textual or historical

---

[5] In support of this request to create an expanded prophylactic, Halverson points to our decision in <u>State v. Knapp</u> where we expanded the scope of the exclusionary rule beyond its federal corollary.  2005 WI 127, ¶2, 285 Wis. 2d 86, 700 N.W.2d 899.  However, <u>Knapp</u> does not suggest anything about whether this court should adopt Halverson's proposed rule in this case.

[6] Article I, Section 8, originally provided in relevant part:  "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  Wis. Const. art. I, § 8 (1848).  It was later amended to add "or herself."

[7] <u>See also</u> <u>State v. Edler</u>, 2013 WI 73, ¶¶29-30, 350 Wis. 2d 1, 833 N.W.2d 564 (acknowledging an exception to this general rule yet nevertheless "declin[ing] to extend the meaning of Wisconsin Constitution Article I, Section 8 in this situation so as to provide different protection than the Fifth Amendment

basis to suggest any meaningful difference between the two provisions meriting an expanded judicially-created prophylactic rule. Nor do we see any basis in the Wisconsin Constitution for Halverson's request.[8]

¶27 Instead, Halverson focuses chiefly on the argument that incarceration inherently creates the kind of custodial circumstances meriting Miranda warnings. We agree, however, with the Supreme Court's determination in Howes that a per se rule does not serve the anti-coercion purposes of Miranda. Interrogation of incarcerated individuals does not always present the "same inherently coercive pressures as the type of station house questioning at issue in Miranda," nor would an inmate always be unable to terminate questioning. Howes, 565

_____

to the United States Constitution"); State v. Ward, 2009 WI 60, ¶55, 318 Wis. 2d 301, 767 N.W.2d 236 ("Article I, Section 8 of the Wisconsin Constitution provides the same protections prior to charging a suspect as does the Fifth Amendment to the United States Constitution."); Hoyer v. State, 180 Wis. 407, 411, 193 N.W. 89 (1923) ("Sec. 8 corresponds in substance with art. V and sec. 11 is identical with art. IV, respectively, of the amendments to the United States constitution."); Thornton v. State, 117 Wis. 338, 340, 93 N.W. 1107 (1903) ("This rule and practice of the common law was crystallized and expressed in the fifth amendment to the constitution of the United States in words identical with those above quoted from sec. 8, art. I of our own constitution.").

[8] Certainly nothing in the text of the Wisconsin Constitution supports Halverson's request. To the extent any historical evidence may assist Halverson's case, he has not presented those arguments here, nor will we develop them for him. See Serv. Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case.").

14

U.S. at 509. As we conclude below, Halverson's circumstances do not even satisfy the standard requirements for custody under Miranda's framework. Further, no facts in Halverson's case indicate coercion or anything close to it. And that is the whole point of requiring Miranda warnings in the first place. In other words, Halverson's case exemplifies the problem with his proposed rule. Officer Danielson's questioning of Halverson simply does not raise the specter of coerced admissions. More to the point, Halverson's relatively benign and distanced interaction demonstrates that incarceration alone lacks the inherent dangers of the station-house interrogation. This was why the United States Supreme Court rejected the per se rule in Howes, and Halverson offers no strong reasons to diverge from this rationale.

¶28 In short, nothing in Article I, Section 8(1) of the Wisconsin Constitution suggests this court should deem all incarcerated individuals "in custody" for purposes of Miranda. Neither the purposes of Miranda warnings nor the text and history of the Wisconsin Constitution support Halverson's invitation to adopt his proposed per se rule.


D. Miranda "Custody" Applied to Halverson

¶29 Halverson has an alternative argument——namely, that he was "in custody" for purposes of Miranda under the prevailing two-step inquiry examining the totality of the circumstances. In conducting this analysis, we accept the circuit court's factual findings unless they are clearly erroneous. State v.

15

Dobbs, 2020 WI 64, ¶28, 392 Wis. 2d 505, 945 N.W.2d 609. Whether those facts support a determination of custody for purposes of Miranda is a question of law we review de novo. Id.

¶30 As previously explained, custody for purposes of Miranda first requires an objective determination of whether the suspect was free to move and terminate the interview. Howes, 565 U.S. at 509; Bartelt, 379 Wis. 2d 588, ¶31. Relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during questioning, and the release of the interviewee at the end of the questioning." Howes, 565 U.S. at 509 (citations omitted); see also Bartelt, 379 Wis. 2d 588, ¶32 ("Such factors include: the degree of restraint; the purpose, place, and length of the interrogation; and what has been communicated by police officers."). Regarding the degree of restraint, "we consider: whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." Bartelt, 379 Wis. 2d 588, ¶32.

¶31 Unlike Miranda challenges in most cases, Halverson's interview occurred over the phone. The State argues, and we agree, that interrogation by phone call is unlikely to rise to the level of Miranda custody. This is so because a phone call will rarely present objective circumstances where a reasonable person would believe he is not free to terminate the

16

interrogation. A suspect can end questioning at any time simply by hanging up. To our knowledge, no court has concluded that a telephonic interrogation triggered <u>Miranda</u> custody.[9] The fact that Officer Danielson's interview occurred by phone strongly weighs against a determination of <u>Miranda</u> custody.

¶32 The length of the interview reinforces the same conclusion. Officer Danielson testified that his conversation with Halverson lasted "a few minutes, maybe three, four." This is far afield from the five- to seven-hour questioning in <u>Howes</u>, which the Supreme Court found did not trigger a determination of custody for purposes of <u>Miranda</u>. <u>Howes</u>, 565 U.S. at 503. Similarly, in <u>State v. Lonkoski</u>, we observed that a 30-minute timeframe weighed against determining the defendant was in <u>Miranda</u> custody. 2013 WI 30, ¶31, 346 Wis. 2d 523, 828 N.W.2d 552. The less-than-five-minute interview here similarly supports the State's argument.

¶33 Halverson responds that unlike the defendant in <u>Howes</u>, he was not informed that he could terminate the interview at any time. This failure, he contends, is fatal to the State's

---

[9] <u>See</u> <u>Pasdon v. City of Peabody</u>, 417 F.3d 225, 227 (1st Cir. 2005) (holding the defendant was not "in custody" when he was asked questions over the phone); <u>State v. Mills</u>, 293 P.3d 1129, 1136 (Utah Ct. App. 2012) (concluding "[t]he overall length, form, and circumstances of the voluntary, transcontinental telephone interview simply do not rise to the level of being so long, so draining, or so fierce as to be problematic under <u>Miranda</u>"); <u>State v. Denton</u>, 792 P.2d 537, 540 (Wash. Ct. App. 1990) (determining the defendant who was in jail at the time of the phone call was not in custody for <u>Miranda</u> purposes because he was free to terminate the phone call at any time).

17

argument. Such a disclosure is certainly relevant to the inquiry, but it is not mandatory. The question remains whether a reasonable person in Halverson's situation would feel free to terminate the interview. According to the unchallenged testimony of Deputy Hoff, Halverson had the choice whether to return Officer Danielson's call in the first place. Halverson did so. Officer Danielson began the call by explaining why he was calling, and Halverson chose to continue the conversation. Officer Danielson testified that he kept his tone calm and neutral during the interview, even after Halverson became more animated. We observe nothing in the record suggesting the brief phone interview was no longer optional after it began. Under these circumstances, a reasonable person would have felt free to terminate the interview by hanging up the phone at any time.

¶34 Halverson's physical environment also shows he was free to terminate the call. When Halverson elected to return Officer Danielson's call, the record suggests a deputy escorted Halverson from his pod to the jail's community room, which doubled as a library. Then, although visually observed during the interview, Halverson spoke to Officer Danielson alone and without physical restraints. The record does not reveal any restraint upon Halverson any more than in his daily life as an inmate.

¶35 For many of the same reasons, proceeding to the second step of the custody analysis, we conclude Halverson's environment did not "present[] the same inherently coercive pressures as the type of station house questioning at issue in

18

Miranda." Howes, 565 U.S. at 509; see also Bartelt, 379 Wis. 2d 588, ¶33. He spoke to Officer Danielson over the phone in the jail's community room where he was alone, without physical restraints, and could sit or stand at will. The interview lasted less than five minutes, and during that time Officer Danielson kept his tone calm. These circumstances are nowhere close to the kind of coercive pressures of station-house questioning that sparked the Supreme Court's holding in Miranda.

¶36 In light of all of these factors, especially the fact that this interview occurred over the phone, we conclude that Halverson was not "in custody" for purposes of Miranda.

III. CONCLUSION

¶37 We decline Halverson's invitation to adopt a per se rule that incarcerated individuals are necessarily "in custody" for purposes of Miranda. Applying the standard two-part test, we conclude Halverson was not "in custody" when Officer Danielson interviewed him by phone regarding the missing property. Halverson's motion to suppress should have been denied, and we remand with directions to the circuit court to do so.

*By the Court.*—The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court with directions.

¶38 REBECCA GRASSL BRADLEY, J. *(concurring).* I join the majority opinion in full. I write separately to address the petitioner's reliance on State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899. Because the Knapp court's interpretation of Article I, Section 8 of the Wisconsin Constitution lacks any mooring in text or history, this court should restore the original meaning of this constitutional provision.

¶39 The procedural posture of the Knapp case is somewhat unusual, with this court having had two separate opportunities to decide it. The defendant, Matthew Knapp, was suspected of killing a woman with a baseball bat. Knapp, 285 Wis. 2d 86, ¶¶3-5. Following the incident, an officer visited Knapp at his apartment to arrest him, and requested the clothes he was wearing the night of the murder. Id., ¶8. Knapp pointed to a sweatshirt containing human blood, which the officer seized. Id., ¶9. During this exchange, the officer intentionally withheld Miranda warnings in an effort to procure the physical evidence. Id., ¶¶14-15. The State charged Knapp with first-degree intentional homicide, after which he filed a motion seeking to suppress the physical evidence obtained at the scene of the arrest. The circuit court denied the motion. On appeal, this court reversed the circuit court's suppression ruling, holding that physical evidence must be suppressed if it was procured while intentionally violating Miranda. State v. Knapp, 2003 WI 121, ¶1, 265 Wis. 2d 278, 666 N.W.2d 881 (Knapp I).

¶40 The State appealed the Knapp I decision to the United States Supreme Court. The Court vacated the judgment and remanded the case back to the Wisconsin Supreme Court in light of the United States Supreme Court's decision in United States v. Patane, 542 U.S. 630 (2004) (plurality opinion). Wisconsin v. Knapp, 542 U.S. 952 (2004). In Patane, the Court held that the failure to give Miranda warnings does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements." Patane, 542 U.S. at 633-34. The Court explained that, within this context, "[t]here is simply no need to extend (and therefore no justification for extending) the prophylactic rule of Miranda." Id. at 643.

¶41 On remand, despite the United States Supreme Court declining to create an expanded prophylactic under the Fifth Amendment's privilege against self-incrimination, the Wisconsin Supreme Court held that the Wisconsin Constitution's analog to the Fifth Amendment——Article I, Section 8——affords greater protections than the United States Constitution. In particular, using different reasoning than its first decision but arriving at substantially the same conclusion, the second Knapp court held that, "[w]here physical evidence is obtained as the direct result of an intentional Miranda violation, . . . [Article I, Section 8 of the Wisconsin Constitution] requires that the evidence must be suppressed." Knapp, 285 Wis. 2d 86, ¶2 (Knapp II). The Knapp II court articulated that, "[i]t is the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries

2

under the Wisconsin Constitution than is mandated by the United States Supreme Court." Id., ¶59 (quoting State v. Doe, 78 Wis. 2d 161, 171, 254 N.W.2d 210 (1977)). According to the Knapp II court, although the text of Article I, Section 8 and the Fifth Amendment are "virtually identical," other factors weighed in favor of expanding state constitutional protections beyond those afforded under the Fifth Amendment. Id., ¶62. More specifically, the Knapp II court invented the sanction of suppressing evidence because the officer's "conduct at issue was particularly repugnant and require[d] deterrence." Id., ¶75. The Knapp II court also invoked the "preservation of judicial integrity" as a basis for contriving a different meaning for Article I, Section 8 than the United States Supreme Court gives the nearly identical Fifth Amendment. Id., ¶¶75-83.

¶42 Knapp II represents an unprecedented departure from the traditional tools employed by this court in interpreting the Wisconsin Constitution.[1] Halverson's reliance on that case to request an expanded prophylactic to protect the privilege against self-incrimination indicates it is time for this court

---

[1] "Before Knapp, the Wisconsin Supreme Court had repeatedly held that in the absence of a meaningful difference in language, intent, or history, the state constitution's Declaration of Rights should be interpreted in conformity with the United States Supreme Court's interpretation of parallel provisions in the Bill of Rights. The language of the state constitutional right against compulsory self-incrimination is virtually identical to the Self-Incrimination Clause of the Fifth Amendment; the court had declined many previous invitations to interpret the state right more expansively than its federal counterpart." The Honorable Diane S. Sykes, Reflections on the Wisconsin Supreme Court, Marq. Law., March 2006, at 59-60.

3

to revisit Knapp II's holding. As we noted in Roberson, "states have the power to afford greater protection to citizens under their constitutions than the federal constitution does." State v. Roberson, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813. Critically, however, "[a] state court does not have the power to write into its state constitution additional protection that is not supported by its text or historical meaning." Id. Restoring the proper method of interpreting Article I, Section 8 is imperative if this court takes seriously its oath to uphold the Wisconsin Constitution. The question for this court is not whether the Wisconsin Constitution should afford greater protections, but whether it "actually affords greater protection[s]." Id. (emphasis added). Rather than applying the actual constitutional meaning of Article I, Section 8, the Knapp II court instead breathed its policy preferences into this provision. It was quite transparent about doing so. "[T]he court accepted the defendant's invitation to——as the court put it——'utilize . . . the Wisconsin Constitution to arrive at the same conclusion as in Knapp I.' This language is revealing for its pure, unvarnished result-orientation." The Honorable Diane S. Sykes, Reflections on the Wisconsin Supreme Court, Marq. Law., March 2006, at 60.

¶43 Despite acknowledging that the text of Article I, Section 8 and the Fifth Amendment are "virtually identical," the Knapp II court nevertheless engaged in judicial gymnastics to justify its disregard for these textual similarities. Knapp, 285 Wis. 2d 86, ¶¶58-62. The only permissible avenue for

4

deviating from the United States Supreme Court's interpretation of the Fifth Amendment would be uncovering a historical meaning of Article I, Section 8 different from the original public meaning of its federal counterpart. The Knapp II court failed to do so.[2] To be sure, the Knapp II court did note that, "shortly after Wisconsin earned statehood," this court declared that "no person is compelled to give evidence against himself, or to testify to any matter tending to criminate himself." Id., ¶63 (citing Schoeffler v. State, 3 Wis. 823, 733 (1854)). This case, however, says nothing to suggest the historical meaning of Article I, Section 8 is any different than its federal analog,

---

[2] Justice Rebecca Dallet's concurrence suffers from the same shortfalls as the court's decision in State v. Knapp, 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899 (Knapp II). Exposing the policy-making of the Knapp II court, Justice Dallet notes that the court "reached [the] conclusion [in Knapp II] for two important reasons: to deter bad police behavior and to preserve the integrity of the judiciary." Concurring op., ¶54. Overstepping the constitutional boundaries of the judicial role, Justice Dallet then charges that "[t]o abandon Knapp II is to abandon this court's long history of upholding the Wisconsin Constitution's protection against overbearing law-enforcement practices." Id., ¶57. While it is the court's responsibility to faithfully apply the protections constitutionally preserved for Wisconsin citizens, this court is confined to interpreting what the Wisconsin Constitution actually says rather than imposing particular justices' policy preferences. Whether or not this court thinks it is a good idea to "deter police behavior" or sanction "overbearing" police practices is simply irrelevant in ascertaining whether the Wisconsin Constitution actually affords heightened protections as compared to the United States Constitution. Only the text of the constitutional provision and its original meaning may resolve this question. State v. Roberson, 2019 WI 102, ¶56, 389 Wis. 2d 190, 935 N.W.2d 813. Imposing judicial policy preferences in the name of a constitutional provision that does not reflect them constitutes an exercise of judicial will and encroaches on a purely legislative prerogative.

5

nor does the <u>Knapp II</u> court even attempt a historical analysis to support such a theory. Instead, <u>Knapp II</u> pivots to declaring that rights under Article I, Section 8 are "sacred" and construed in favor of private citizens. <u>Id.</u> This analysis falls far short of substantiating the <u>Knapp II</u> court's conclusion that Article I, Section 8 embodies heightened protections, especially for a provision that repeats the federal text nearly verbatim.

¶44 Instead of exploring the meaning of the Wisconsin Constitution's text, as <u>Roberson</u> instructs, <u>Knapp II</u> relied heavily upon the view that the officer's conduct was "repugnant" and "require[d] deterrence," and that this court needed to "preserv[e] . . . judicial integrity." <u>Knapp</u>, 285 Wis. 2d 86, ¶¶75, 79. Judicial policy goals, however estimable, cannot alter the meaning of the state constitution. "It is simply not compatible with democratic theory that laws mean whatever they ought to mean, and that unelected judges decide what that is." Antonin Scalia, <u>Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws</u>, <u>in</u> <u>A Matter of Interpretation: Federal Courts and the Law</u> 22 (Amy Gutmann ed., 1997). The judiciary must exercise its judgment, not its will. These principles do not reflect a novel approach to constitutional interpretation but form the core of the Founders' conception for the judicial role. <u>See</u> The Federalist No. 78 (Alexander Hamilton) ("The judiciary . . . can take no active resolution whatever. It may truly be said to have neither force nor will, but merely

6

judgment."). "It is, in other words, the judge's job to employ not his own will but the traditional tools of legal analysis[.]" Neil Gorsuch, A Republic, If You Can Keep It 195 (1st ed., 2019).

¶45 The Knapp II court discarded these venerable principles, impermissibly factoring into its analysis what a majority of justices believed was "not tolera[ble]" and importing a non-textual, ahistorical consequence in reaction to "the police deliberately ignoring Miranda's rules as a means of obtaining inculpatory physical evidence." Knapp, 285 Wis. 2d 86, ¶72. Neither "repugnant" facts nor intolerable actions have anything to say about the meaning of the privilege against self-incrimination set forth in the Wisconsin Constitution or the remedies for its violation; they are solely justifications for the exercise of judicial will.

¶46 In this case, the court correctly determines that Halverson fails to provide a "textual or historical basis to suggest any meaningful difference between the two provisions meriting an expanded judicially-created prophylactic rule." Majority op., ¶26. The same was true in Knapp II. Article I, Section 8 states, in part, that "[n]o person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal witness against himself or herself." Wis. Const. art. I, § 8. Wisconsin's clause mirrors the Fifth Amendment: "[no person] shall . . . be subject for the same offence to be twice put in jeopardy of life

7

or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. During Wisconsin's constitutional ratification, the people adopted many provisions that closely parallel their federal counterparts, including——as relevant for Miranda——the right against compulsory self-incrimination. See Ray A. Brown, The Making of the Wisconsin Constitution: Part II, 1952 Wis. L. Rev. 23, 58 (1952).

¶47 With this understanding, Wisconsin courts have repeatedly held that the clauses embodying the privilege against self-incrimination in the state and federal constitutions are interpreted in lock-step. In State v. Ward, for example, this court held that, in regard to the waiver of Miranda rights prior to criminal charging, "Article I, Section 8 of the Wisconsin Constitution provides the same protections . . . as does the Fifth Amendment to the United States Constitution." 2009 WI 60, ¶55, 318 Wis. 2d 301, 767 N.W.2d 236. See also State v. Edler, 2013 WI 73, ¶30, 350 Wis. 2d 1, 833 N.W.2d 564 ("We decline to extend the meaning of Wisconsin Constitution Article I, Section 8 in this situation so as to provide different protection than the Fifth Amendment to the United States Constitution."). Knapp II is the only case to depart from Wisconsin's longstanding approach to interpreting Article I, Section 8 and the Fifth

Amendment in consonance.[3] But <u>Knapp II</u> offered no foundation for abandoning the court's well-established understanding of the privilege against self-incrimination and the remedy for its breach.

¶48 <u>Knapp II</u>'s holding lacks any foundation in the text or historical meaning of the constitutional language it construed. It rests solely on judicial policy preferences rather than the law and was rendered without any textual analysis or historical examination of the controlling language of the constitution. While state constitutional provisions may afford greater protections than the United States Constitution, the constitution itself must actually provide them. Although a majority of this court may prefer certain constitutional protections for criminal suspects, it remains the prerogative of the people of Wisconsin to bestow them. Because Article I, Section 8 does not require suppression of evidence obtained as the result of voluntary statements made by a criminal suspect from whom the reading of <u>Miranda</u> rights was withheld, only a constitutional amendment could create this remedy. The court in

---

[3] In her concurrence, Justice Dallet maintains that to interpret Article I, Section 8 in consonance with the Fifth Amendment is "to ignor[e] [this court's] robust tradition of independently interpreting the Wisconsin Constitution." Concurring op., ¶57. Not so. Of course "states have the power to afford greater protections to citizens under their constitutions than the federal constitution does." <u>Roberson</u>, 389 Wis. 2d 190, ¶56. But the constitution must actually do so——not because a justice desires such protections, but because <u>the people</u> do. Neither the <u>Knapp II</u> court nor Justice Dallet performed an analysis of the text or original understanding of Article I, Section 8 necessary to support their proffered interpretation of that constitutional provision.

9

Knapp II acted beyond its authority in devising it.  Its holding should be overturned.  I respectfully concur.

¶49 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

¶50 REBECCA FRANK DALLET, J. (*concurring*). As the majority aptly recognizes, neither the United States nor the Wisconsin Constitution supports a judicially created, per se rule by which all incarcerated persons are in custody for purposes of Miranda.[1] I write separately to emphasize that the Wisconsin Constitution was never intended to be interpreted in lockstep with the United States Constitution. Indeed, when it comes to certain individual liberties, particularly the right against self-incrimination, this court has long held that the Wisconsin Constitution provides greater protection than its federal counterpart.

I

¶51 As long ago as 1855, we recognized that "[t]he people of this state shaped our constitution, and it is our solemn responsibility to interpret it." See Attorney Gen. ex rel. Bashford v. Barstow, 4 Wis. 567 (*567), 786 (*757) (1855). In order to protect individual liberties, this court "will not be bound by the minimums . . . imposed by the [United States] Supreme Court." State v. Doe, 78 Wis. 2d 161, 172, 254 N.W.2d 210 (1977); see also State v. Roberson, 2019 WI 102, ¶¶99-101, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting) (noting this court's 160-year history of interpreting the Wisconsin Constitution as granting protections over and above those recognized in the United States Constitution). The individual liberties protected by the Wisconsin Constitution, especially the right against self-

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

1

incrimination, are fundamental to our liberty and must be staunchly guarded by this court:

> The rights intended to be protected by [Article I, Section 8 of the Wisconsin Constitution] are so sacred, and the pressure so great towards their relaxation in case where suspicion of guilt is strong and evidence obscure, that <u>it is the duty of the courts to liberally construe the prohibition in favor of private rights</u>, and to refuse to permit those first and doubtful steps which may invade it in any respect.

Thornton v. State, 117 Wis. 338, 341, 93 N.W. 1107 (1903) (emphasis added). Even before the exclusionary rule became obligatory upon the states pursuant to Mapp v. Ohio, 367 U.S. 643 (1961), we held that evidence seized in violation of the right against self-incrimination must be excluded from trial, thus elevating the right to one of substance rather than a mere "form of words."[2] See Hoyer v. State, 180 Wis. 407, 415-16, 193 N.W. 89 (1923). We explained that there was "no reason in logic, justice, or in that innate sense of fair play," that evidence obtained in violation of one's right against self-incrimination should be treated any differently than that obtained in violation of one's right to be free from unreasonable searches and seizures. Id. at 417 (reasoning that both constitutional guarantees were of "equal standing and value").

¶52 It was therefore no surprise when, nearly a century after Hoyer, we held in State v. Knapp (Knapp II), 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, that the Wisconsin

---

[2] Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920).

2

Constitution requires the suppression of physical evidence obtained via an intentional Miranda violation. Id., ¶2. The facts of Knapp II are particularly egregious. Detective Timothy Roets arrived at Matthew Knapp's apartment ostensibly to arrest him for consuming alcohol, a parole violation. But in reality, the arrest was the start of Roets's investigation into Knapp for a woman's murder the night before. When Knapp saw Roets, he picked up the phone to call his attorney. Knapp eventually hung up the phone and let Roets in; Knapp informed Roets that he had been attempting to call his attorney. Without reading Knapp his Miranda warnings, Roets asked Knapp about the clothes he had been wearing the night before. Knapp pointed to a pile of clothes on the floor, which contained a bloody sweatshirt. Roets collected those clothes and formally placed Knapp under arrest. During continued questioning by Roets, Knapp twice said that an attorney told him not to talk to the police and that he would not write or sign a statement without an attorney. Roets never read Knapp the Miranda warnings. Id., ¶¶7-10.

¶53 At a Miranda-Goodchild hearing,[3] Roets admitted that he deliberately did not inform Knapp of his Miranda rights. Roets testified he was concerned that Knapp, who had requested an attorney, would refuse to make a statement once he learned of his rights. So, "to keep the lines of communication open,"

---

[3] At a Miranda-Goodchild hearing, the court adjudicates the admissibility of evidence obtained contrary to the right against self-incrimination. See State v. Jiles, 2003 WI 66, ¶25, 262 Wis. 2d 457, 663 N.W.2d 798; State ex rel. Goodchild v. Burke, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

3

Roets purposefully withheld the Miranda warnings prior to questioning Knapp about his clothing. Id., ¶¶13-14.

¶54 This court held that, under Article I, Section 8 of the Wisconsin Constitution, the exclusionary rule bars the prosecution from introducing at trial the "physical fruits"——in Knapp II, the bloody sweatshirt——of a deliberate Miranda violation. We reached this conclusion for two important reasons: to deter bad police behavior and to preserve the integrity of the judiciary. First, we reasoned that the Constitution could not abide such repugnant police conduct. Id., ¶75. We recognized that holding otherwise would send law enforcement the wrong message; that it was "better to interrogate a suspect without the Miranda warnings than to use legitimate means to investigate crime." Id., ¶77 (quoted source omitted). The Constitution, however, does not permit law enforcement to intentionally disregard its personal-liberty guarantees in order to obtain evidence.

¶55 Second, we noted that the judicial system maintains its reputation as a fair and neutral arbiter only if it holds all parties to the same constitutional standards. Id., ¶79. Safeguarding Wisconsinites' constitutional rights means ensuring that those rights are protected throughout the entire prosecutorial process. But that process would be "systematically corrupted" if we were to allow into the courtroom evidence obtained by unconstitutional "investigatory shortcuts." Id., ¶81. Indeed, just as "[i]t is not too much to expect law enforcement to respect the law," it is not too much

4

to expect the same of this court. See id. ("[F]air play requires the players to play by the rules, especially those players who enforce the rules.").

II

¶56 Neither party has asked us to overturn Knapp II. In fact, at oral argument, the State expressly told the court that it was "not asking for Knapp II to be overturned."[4] And, as the majority rightly points out, "Knapp [II] does not suggest anything" about how the court should resolve Halverson's case. Majority op., ¶25 n.5.

¶57 Yet Justice Rebecca Grassl Bradley's concurrence calls on the court to overturn Knapp II anyway, ignoring our robust tradition of independently interpreting the Wisconsin Constitution.[5] But to do so would not only erode Wisconsinites'

---

[4] https://wiseye.org/2020/09/14/wisconsin-supreme-court-oral-argument-state-v-brian-l-halverson/, at 33:22.

[5] Justice Rebecca Grassl Bradley's concurrence charges that Knapp II is out of step with the United States Supreme Court's interpretation of the Fifth Amendment in United States v. Patane, 542 U.S. 630 (2004) (plurality op.). This assertion rests on a thin reed. See generally Yale Kamisar, Postscript: Another Look at Patane and Seibert, The 2004 Miranda "Poisoned Fruit" Cases, 2 Ohio St. J. Crim. L. 97, 97-107 (2004).

5

constitutional protections by sanctioning flagrant and deliberate due-process violations, it would also take a step toward making our own Constitution redundant with the federal one. See Lynn Adelman & Shelley Fite, Exercising Judicial Power: A Response to the Wisconsin Supreme Court's Critics, 91

---

Patane is a plurality opinion with only three Justices concluding that, in the Fifth Amendment context, the exclusionary rule could never reach non-testimonial "fruits" obtained as the result of a Miranda violation. Patane, 542 U.S. at 633-34. That rationale was explicitly disavowed by the two concurring Justices. Id. at 645 (Kennedy, J., concurring). Instead, the concurrence applied a balancing test much like the one used in the Fourth Amendment context, counterbalancing "the concerns underlying" the Miranda rule against the "other objectives of the criminal justice system." Id. at 644. A majority of the Justices in Patane thus agreed that a balancing test, and not the plurality's absolute rule, was the proper approach. See 1 Robert P. Mosteller et al., McCormick on Evidence § 176 (8th ed. 2020) (noting that a majority of the Patane Court "agreed that whether the Miranda federal constitutional exclusionary requirement should and would extend to fruit of the poisonous tree depended on balancing the value of excluding fruit as a means of deterring conduct violating the constitutional provision against the costs of doing so").

As the Court did in Patane, we engaged in a balancing analysis in Knapp II; we just reached a different conclusion. See State v. Knapp (Knapp II), 2005 WI 127, ¶¶33-43, 72-81, 285 Wis. 2d 86, 700 N.W.2d 899. That result is justified by the stark contrast between the egregious violation in Knapp II and the excusable Miranda error in Patane. Compare Knapp II, 285 Wis. 2d 86, ¶¶7-10, with Patane, 542 U.S. at 635 (plurality op.) ("Detective Benner attempted to advise respondent of his Miranda rights but got no further than the right to remain silent. At that point, respondent interrupted, asserting that he knew his rights, and neither officer attempted to complete the warning."). Other states have also examined Patane but afforded broader protections under their state constitutions. See, e.g., State v. Vondehn, 236 P.3d 691 (Or. 2010) (en banc); State v. Peterson, 923 A.2d 585 (Vt. 2007); State v. Farris, 849 N.E.2d 985 (Ohio 2006); Commonwealth v. Martin, 827 N.E.2d 198 (Mass. 2005).

6

Marq. L. Rev. 425, 443-44 (2007) (observing that the state legislature has "historically failed to regulate the conduct of law enforcement," leaving it to the courts to prevent constitutional abuses); see also Jeffrey Sutton, 51 Imperfect Solutions 47-83 (2018) (cautioning states to avoid "lockstepping," particularly in the criminal-procedure context). To abandon Knapp II is to abandon this court's long history of upholding the Wisconsin Constitution's protection against overbearing law-enforcement practices, even if those practices meet the federally mandated minimum requirements. See Doe, 78 Wis. 2d 161, 171-72; Hoyer, 180 Wis. 407; see also Sutton, supra at 47-83.

¶58 Federal courts interpret the federal constitution. We have the final say on ours. Bashford, 4 Wis. at 786 (*757). And for nearly a century, we have held that, in comparison to those protected by the federal constitution, the individual liberties enshrined in the Wisconsin Constitution are rights "of substance rather than mere tinsel." See Hoyer, 180 Wis. at 415. We should keep it that way.

¶59 For the foregoing reasons, I respectfully concur.

¶60 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this concurrence.

7